RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

     *v.*                                          No. 10-4529

MAJEED BAZAZPOUR,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:08-cr-171-3—Lesley Brooks Wells, District Judge.

Decided and Filed: August 15, 2012

Before: SILER, DAUGHTREY, and WHITE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Lawrence DeLino, Jr., Akron, Ohio, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge. Having been found guilty by a jury on six counts of a 21-count indictment against multiple defendants, Majeed Bazazpour appeals his 240-month prison sentence, as well as aspects of his convictions for conspiracy to commit money laundering, aiding and abetting money laundering, conspiracy to commit arson, and aiding and abetting arson. Specifically, he asserts that one subsection of the federal money laundering statute, 18 U.S.C. § 1957(f)(1), is unconstitutionally vague and overbroad; that the prosecution failed to adduce sufficient evidence to support the convictions for conspiracy to commit arson, conspiracy to

commit money laundering, and aiding and abetting arson; and that the prison sentence imposed "in this matter was improper, excessive[,] and an abuse of discretion." We affirm Bazazpour's convictions, but because we conclude that the district court should not have applied a two-level sentence enhancement for obstruction of justice, we vacate defendant Bazazpour's sentence and remand this matter to the district court for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Bazazpour, a Canadian citizen born in Iran, immigrated to Ohio in late 1996. Upon arriving in the Youngstown area, the defendant stayed for a short time with his second cousin, Cyrus Ghassab, and Ghassab's wife, Farideh Jamali, before finding his own place to live. Between that time and November 2005, Bazazpour, Ghassab, Jamali, and others were involved in various illegal acts in and around Youngstown, including conspiracy to commit mail fraud, money laundering, and arson, as well as aiding and abetting the actual commission of mail fraud, money laundering, and arson. After a lengthy trial, the jury found Bazazpour guilty of committing the following criminal acts alleged in the indictment:

*Count 1 (Conspiracy to Commit Mail Fraud)*: Bazazpour and others conspired to use the United States mail to submit fraudulent insurance claims and receive insurance proceeds for fire damage that the co-conspirators either caused themselves or hired other individuals to cause. As part of the conspiracy, the defendant made material misrepresentations to the insurance companies by failing to disclose prior property losses as requested on the insurance applications.

*Count 2 (Conspiracy to Commit Arson of an Interstate Building)*: Bazazpour and others conspired to set fires or hire other individuals to set fires at buildings under the control of the conspirators and then to collect insurance proceeds by filing false claims relating to those fires.

*Count 3 (Conspiracy to Commit Money Laundering)*: Bazazpour and others conspired to conduct financial transactions involving the proceeds obtained through

unlawful activity in order to disguise the nature and source of those proceeds. Specifically, Jamali deposited into the account created in the name of Ghassab and Jamali a check from Harleysville Insurance Company in the amount of $421,062, an amount that represented the proceeds of a fraudulent insurance claim. Ghassab then transferred $54,000 of that payment to Bazazpour who deposited the check into his own account.

*Count 6 (Aiding and Abetting Arson in the Commission of a Felony)*: Bazazpour and Ghassab set fire to the JB's Foods building in Youngstown, Ohio, in order to obtain the insurance proceeds for the damage caused by the arson.

*Count 13 (Aiding and Abetting Mail Fraud)*: Bazazpour used the United States mail to file a claim for loss as a result of the fire that he set at the JB's Foods building in Youngstown, Ohio.

*Count 16 (Aiding and Abetting Money Laundering)*: Bazazpour deposited a check for $54,000 into his bank account knowing that the money was derived from unlawful activity.

The district court sentenced the defendant to 60 months in prison for conspiring to commit mail fraud, 60 months for conspiring to commit arson, 120 months for conspiring to commit money laundering, 120 months for aiding and abetting mail fraud, and 120 months for aiding and abetting money laundering. Each of those sentences was ordered to run concurrently with the others. The district judge also sentenced Bazazpour to a consecutive 120-month sentence for aiding and abetting arson, resulting in an effective prison sentence of 240 months, or 20 years. Additionally, the district judge ordered the defendant to serve three years of supervised release, to pay a $600 special assessment, and to make restitution to three insurance companies in a total amount of $778,648.64.

## II. DISCUSSION

### A.  Challenge to the Constitutionality of the Money Laundering Statute

On appeal, Bazazpour first seeks to overturn his conviction of aiding and abetting money-laundering, alleging that the definition of "monetary transaction" in 18 U.S.C. § 1957(f)(1), part of the federal money-laundering statute, is unconstitutionally vague and overbroad. In mounting this challenge, he contends that the statute improperly dispenses with the necessity of proving a defendant's criminal intent in depositing money into a federally-insured bank account.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal  offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996).  Because Bazazpour did not raise this challenge in the district court, however, we may review his claim of constitutional deficiency for plain error only.  Consequently, before we can correct such an error, we must find that there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467 (citation and internal quotation marks omitted); *United States v. Keller*, 665 F.3d 711, 714 (6th Cir. 2011), *cert. denied*, 132 S.Ct. 2714 (2012).

In 18 U.S.C. § 1957(a), Congress chose to impose criminal liability upon an individual who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."  Subsection (f)(1) of that same statute further defines the term "monetary transaction" to mean, in relevant part, "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary

instrument . . . by, through, or to a financial institution . . . ." Bazazpour complains, however, that the statute transforms an innocent act – depositing a check into one's own account – into a crime. Although the defendant concedes in his brief that the transfer, exchange, and withdrawal of funds from a bank account are arguably deceptive acts indicative of an attempt to launder money, he maintains that criminalizing a simple deposit of funds in a readily identifiable account unconstitutionally eliminates the criminal intent element of the crime of money-laundering.

In so arguing, however, Bazazpour reads the relevant statute selectively. It is no doubt accurate to assert that simply depositing a check into one's own bank account is a relatively common action that carries with it no indicia of criminality. The federal money laundering statute does not, however, criminalize simply depositing a check into an account. As made explicit by 18 U.S.C. § 1957(a), criminal liability attaches to such an otherwise innocent act when, and only when, the government proves beyond a reasonable doubt that the defendant *knowingly* engaged in such a transaction involving "criminally derived property of a value greater than $10,000" that "is derived from specified unlawful activity." By attaching such a knowledge requirement to the "monetary transaction," the statute defines "the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. *See also United States v. Baker*, 19 F.3d 605, 614 (11th Cir. 1994) (Section 1957 is constitutional as applied to defendants who deposited into their own bank accounts funds derived from their own criminal fraud activities.). Thus, there is no merit to Bazazpour's constitutional challenge to 18 U.S.C. § 1957(f)(1).

**B. Challenge to the Sufficiency of the Evidence**

The defendant next contends that the prosecution failed to adduce sufficient evidence to establish his guilt of conspiracy to commit money-laundering, conspiracy to commit arson, and aiding and abetting arson. As in any other challenge to the legal adequacy of the convicting evidence, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In doing so, however, we may not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury.  *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

**1.  Conspiracy to commit money-laundering**

In challenging the sufficiency of the evidence supporting his conviction of conspiracy to commit money-laundering, Bazazpour argues only "that the indictment as it reads does not contain an 'overt' act on the part of [the defendant]."  The simple answer to Bazazpour's objection is that a conviction for conspiracy to commit money-laundering under 18 U.S.C. § 1956(h) – the provision under which the defendant was charged, tried, and found guilty – "does not require proof of an overt act in furtherance of the conspiracy."  *Whitfield v. United States*, 543 U.S. 209, 219 (2005).  *See also United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006) (government need prove only that defendant "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment").  In this case, the prosecution established that  Bazazpour, Jamali, and Ghassab conspired to obtain fire insurance on JB's Foods and then undertook actions to have the building burned.  Because the building was titled in the names of Jamali and Bazazpour, Harleysville Insurance Company of Ohio mailed a check for $421,062 to Jamali, Bazazpour, and Matthew Giannini, their attorney.  The check was then endorsed by the payees for deposit to the account of Jamali and Ghassab at Sky Bank.  Furthermore, $54,000 of that amount was then made payable to Bazazpour by an official check dated January 14, 2005, which Bazazpour then deposited into his personal savings account at Home Savings and Loan. Faced with this evidence, a rational trier-of-fact would be justified in concluding that Bazazpour, Ghassab, and Jamali conspired to launder fraudulently-received money through the bank accounts of Ghassab and Bazazpour.

**2. Conspiracy to commit arson**

Similarly, sufficient evidence was adduced to support the defendant's conviction of conspiring to commit arson. In Count 2 of the indictment, the prosecution listed a number of overt acts committed in furtherance of the conspiracy. The overt acts in which Bazazpour allegedly participated included: (1) setting fire to a building located at 2606 Glenwood Avenue in Youngstown, Ohio, on April 20, 1998; (2) setting fire to a building located at 608 North Garland in Youngstown, Ohio, on December 11, 1999; (3) setting fire to a building located at 2604-2606 Glenwood Avenue in Youngstown, Ohio, on April 22, 2004; and (4) setting fire to a building located at 2732 Glenwood Avenue in Youngstown, Ohio, on June 24, 2005. The defendant argues, however, that those overt acts cannot support his conspiracy conviction because the jury actually acquitted Bazazpour of setting the fires on April 20, 1998, December 11, 1999, and June 24, 2005.

Nevertheless, the jury did find beyond a reasonable doubt that the defendant was guilty of aiding and abetting the setting of the April 22, 2004, fire at 2604-2606 Glenwood Avenue. That single overt act is thus legally sufficient to support the conspiracy charge. Coupled with testimony that Bazazpour misled insurance agents in obtaining insurance for the 2604-2606 Glenwood property and that Earl Adams overheard Bazazpour threatening to reveal that he and Ghassab set the fire at JB's Foods unless Ghassab paid him $100,000 that Bazazpour felt he was owed from insurance proceeds from a previous fire, a rational trier-of-fact would have more than enough evidence to convict Bazazpour on the charge of conspiracy to commit arson.

**3. Aiding and abetting arson**

That same evidence refutes the defendant's claim that the jury had before it insufficient proof to support his conviction of aiding and abetting the setting of the fire at 2604-2606 Glenwood Avenue on April 22, 2004. As indicated previously, Earl Adams testified before the jury that he overheard the defendant threaten "to go and tell the Feds about how [Ghassab and Bazazpour] set the fires and burned down" JB's if

Ghassab failed to pay him $100,000 that Bazazpour believed was owed to him. If believed by the jury, such testimony, in conjunction with the other proof already presented, would justify the verdict rendered.

The defendant contends, however, that Adams's testimony was "incredible" and thus cannot serve as the foundation for a conviction, especially when Bazazpour's acquittal on other arson charges included in the indictment demonstrated that the jury did not fully believe Adams's account of his dealings with the defendant. On appellate review, however, we are not in a position to judge the credibility of witnesses who testified at trial. *See Hilliard*, 11 F.3d at 620. Furthermore, we recognize that a jury may properly "accept or reject testimony in whole or in part." *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 797 (6th Cir. 1996). Consequently, the fact that the jury chose to credit Adams's testimony in regard to the fire at JB's Foods in April 24, but not necessarily in regard to other alleged crimes, does not undermine the jury's verdict that Bazazpour aided and abetted arson of JB's Foods on April 22, 2004.

## C.  Challenge to the Reasonableness of the Sentence

In his final appellate issue, Bazazpour wages a multi-pronged attack on the effective 240-month prison sentence that the district judge imposed upon him. He contends that the district court erred in calculating his base offense level; that the court should have reduced his sentence due to the duress under which Bazazpour was operating; that the court improperly considered him to be a manager or supervisor of the offenses; and that the court erred in enhancing his sentence for obstruction of justice.

We review a district court's imposition of a sentence for reasonableness, using the deferential abuse-of-discretion standard. *See United States v. Pearce*, 531 F.3d 374, 384 (6th Cir. 2008). Such review "has both a procedural and a substantive component." *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including

an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. A review for substantive reasonableness "will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* Furthermore, "we may apply a rebuttable presumption of reasonableness to sentences within the Guidelines," *Pearce*, 531 F.3d at 384, and may not reverse a district court's sentencing determination simply because we "might reasonably have concluded that a different sentence was appropriate." *Gall*, 552 U.S. at 51.

## 1. Calculation of the loss

We first address Bazazpour's assertion that the district court applied the wrong base offense level under the Guidelines. He claims that the court calculated the total amount of laundered funds as $50,000 less than the amount listed in the presentence report, then used a higher base offense level than the one recommended in the presentence report.[1]

This argument lacks merit. Under the federal sentencing guidelines, the base offense level for money-laundering is either the "offense level for the underlying offense from which the laundered funds were derived" or eight plus the "number of offense levels . . . corresponding to the value of the laundered funds." USSG § 2S1.1(a). In the presentence report, the probation officer calculated Bazazpour's base offense using the first method: seven for the underlying theft offense plus 14 based upon the application of the theft guidelines and the calculation that the total funds laundered equaled $830,871.49, for a total base offence level of 21. *See* USSG § 2B1.1(b)(1)(H).

At the government's urging, however, the district court used the second method, eight plus fourteen levels for the amount laundered, to calculate a total base offense level of 22. Nevertheless, both the probation officer and the prosecutor also recommended a multiple-count adjustment pursuant to § 3D1.4 of the Guidelines., a recommendation that the district court adopted. As a result, the court applied the highest base offense

---

[1]We note that the district court did not calculate the total amount of the laundered funds during sentencing. The court did, however, order restitution in the amount of $778, 648.64. We assume that this is the amount to which Bazazpour refers.

level for the counts on which Bazazpour was convicted, *i.e.*, arson, with a base offense level of 24. Thus, the court's choice of method for calculating the base offense for the money-laundering conviction became irrelevant because the court properly used an adjusted level of 24 as its starting point for determining the appropriate sentence to impose.

## 2. Duress or coercion

Similarly, Bazazpour's sentence is not subject to modification simply because of the district court's decision not to depart downward from the Guideline range due to the duress or coercion allegedly felt by the defendant. *See* USSG § 5K2.12. The law in this circuit is clear that we have no jurisdiction to review a decision of a district court "not to depart downward unless the record shows that the district court was unaware of, or did not understand, its discretion to make such a departure." *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008). In this case, the district judge specifically noted that she "looked for . . . any sentencing factors that would warrant a" reduction in the Guideline sentencing range identified in the presentence report but "just [didn't] find them." Under such circumstances, we are without authority to second-guess the district judge's refusal to depart downward from the Guideline sentencing range.

## 3. Manager or supervisor

Bazazpour also suggests that the district court erred in increasing his offense level by two levels for acting as a manager or supervisor of the offenses. *See* USSG § 3B1.1(c). Although the probation officer who compiled Bazazpour's presentence report did not see fit to apply any adjustment for the defendant's role in the offenses, in its sentencing memorandum the government did argue that Bazazpour was indeed a manager or supervisor deserving of an increased sentence. Specifically, the government stated:

> Defendant should be classified as a manager or supervisor due to the nature of his participation, in owning the businesses, submitting fraudulent insurance documents, and soliciting other co-conspirators to participate. U.S.S.G. § 3B1.1 App. Note 4 (one factor to consider is "the

nature of participation in the commission of the offense"). He claimed rights to a larger share of the proceeds when he sued Cyrus Ghassab for additional insurance proceeds. U.S.S.G. § 3B1.1 App. Note 4 (one factor to consider is "the claimed right to a larger share of the fruits of the crime"). Defendant exercised control and authority over others. U.S.S.G. § 3B1.1 App. Note 4 (consider "control and authority exercised over others"). The strongest indication of his control is evidenced by the fact that for the entire year and a half when Defendant lived in Florida, no fires occurred. (Bazazpour at Trial Transcript 235). Defendant left for Florida in the middle of 2000 and returned in late 2001. (Id.). Before Defendant went to Florida, three fires were set; none were set while he was out of state; after he returned, six fires were attempted and/or set. This level of participation warrants a two-level increase in the offense level.

At the sentencing hearing, Bazazpour's attorney highlighted a portion of the presentence report in which the probation officer quoted the defendant's ex-wife as stating that Bazazpour was directed in his activities by Ghassab, that he performed a great deal of work for Ghassab, and that "[Ghassab] and Farideh Jamali ran the defendant 'like a robot.'" Nevertheless, in imposing the two-level increase for serving as a manager or supervisor, the district judge noted, "I have a very different view of his role and his own autonomy in the role. So I don't take issue with this as you would." In light of the information before the district court in the government's sentencing memorandum and the testimony recounted in the trial transcript, we conclude that the district judge did not err in applying the § 3B1.1(c) enhancement in this case. *See United States v. Young*, 553 F.3d 1035, 1052-53 (6th Cir. 2009) (unnecessary to decide whether application of a § 3B1.1 enhancement is reviewed *de novo* or for clear error when defendant's allegation of error fails under either standard).

**Obstruction of justice**

In his final challenge to his sentence, Bazazpour submits that the district court erred in enhancing his base offense level for obstructing the administration of justice, pursuant to USSG §3C1.1. Although we apply a clearly-erroneous standard of review to the district court's findings of fact, the determination of whether specific facts actually constitute an obstruction of justice is a mixed question of fact and law that we review *de*

*novo.  See United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir.), *cert. denied*, 130 S. Ct. 476 (2011) (citing *United States v. Roberts*, 243 F.3d 235, 237 (6th Cir. 2001)).

In contesting the application of the obstruction-of-justice enhancement, Bazazpour argues that the simple fact that his testimony at trial differed from the government's version of events did not justify the district court's imposition of the two-level enhancement.  In fact, the application notes to the Guidelines themselves provide that § 3C1.1 "is not intended to punish a defendant for the exercise of a constitutional right" and that courts "should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  USSG § 3C1.1, comment. (n.2).

Attempting to balance the defendant's constitutional right to testify in his own defense with the government's desire to enhance Bazazpour's sentence for obstruction of justice, the district judge relied on both non-testimonial and testimonial statements by the defendant to support application of the enhancement provision.  In doing so, the district court explained:

> [T]here were situations that occurred during the trial that – for example, as the Sarsours tried to testify, the Defendant threatened them through somebody else.  And that is an act that is meant to obstruct justice.  That had nothing to do with what he was testifying to at trial.
>
> I think there's one other place.  Let me see if I can pull it up.  Oh, it's the insurance investigators.  [T]he Government points out that the Defendant consistently lied to insurance agents and insurance investigators, including the times when he provided statements under oath.  He testified that his insurance forms reported no losses when, in fact, he did incur losses due to fire.  He never notified anyone to correct the error, never reported things that were lost.  When he was questioned under oath by the Harleysville people, he didn't provide Cyrus Ghassab's full name and said he was the only one with a key, but that wasn't true.
>
> There was the statement under oath to the Harleysville people when he was asked whether he had been involved in the Valley Bar business or building.  In fact, he had a key to the building.  Then Brian Churchwell – he didn't, he didn't disclose to Brian Churchwell that Iraj Nasseri was

an owner of the building, and apparently lied to the State Farm agent denying previous losses on his insurance form.

He had admitted in conversations with Harleysville insurance that he had a gun and that it belonged to the store. During his testimony, he denied keeping a gun at the store. Frank Tenn[e]y and Earl Adams testified that he told them not to talk to the ATF. He denied that.

So while I think that a person taking the stand in his own defense has a lot of leeway to do a lot of things, it can cross a line, and the question here is whether or not the line he crossed is one which impedes the administration of justice or obstructs justice.

Without question, threatening witnesses and lying under oath can constitute obstructions of justice. *See* USSG 3C1.1, comment. (n.4(A), (B), and (F)). However, some of the incidents upon which the district court relied to enhance Bazazpour's sentence do not qualify under the Guidelines' obstruction-of-justice adjustment.

The § 3C1.1 enhancement applies only "where a defendant engages in obstructive conduct with knowledge that he or she is the subject of an investigation or with the 'correct belief' that an investigation of the defendant is 'probably underway.'" *United States v. Brown*, 237 F.3d 625, 628 (6th Cir. 2001) (citations omitted). "Consequently, a defendant who engages in obstructive conduct prior to the investigation, prosecution, or sentencing of the instant offense is not subject to the enhancement." *United States v. Baggett*, 342 F.3d 536, 541 (6th Cir. 2003).

In this case, Ahlem Sarsour testified at trial that she and her husband previously owned a store across the street from Bazazpour's beauty supply store. When the two stores began to compete for the sale of drinks and snacks in the neighborhood, the defendant threatened that something might happen to their business, and two months later, the Sarsours' store burned. Despite that threat, and despite the fact that both Ahlem and Zuhar Sarsour were witnesses at Bazazpour's trial, the statements made by the defendant to the Sarsours were made before and not after the initiation of the official federal investigation leading to Bazazpour's indictment and conviction. Thus, those threats could not justify application of the § 3C1.1 enhancement.

Similarly, the false or incomplete statements made by the defendant on applications for insurance on the buildings that would later suffer fire damage were not obstructive conduct under the Guidelines. Clearly those statements were made by Bazazpour prior to his knowledge that he was the subject of any investigation or prosecution for the underlying charges.

In deciding to impose the obstruction-of-justice enhancement, the district court also referred to the testimony of two individuals, Frank Tenney and Earl Adams, indicating that those individuals testified under oath that the defendant "told them not to talk to the ATF." The district court obviously viewed such testimony as evidence of an effort on Bazazpour's part to interfere with or obstruct an investigation. The actual testimony was, however, somewhat ambiguous and not necessarily indicative of an intent to obstruct an investigation. As Tenney testified, the statements at issue were made after a police report was issued regarding a fire for which Ghassab and Bazazpour were being investigated. After the defendant explained that he and Ghassab had been involved in setting various fires in the Youngstown area, Bazazpour suggested to Tenney, "I wouldn't talk to the ATF . . . . They're bad people, they can get you in trouble." The statement reflects only an indirect threat, at most.

On the other hand, Bazazpour also made what could be found to be myriad perjurious statements when testifying at trial. For instance, he repeatedly denied both having made misrepresentations on the insurance applications and having made false statements to the insurance investigators, despite their testimony to the contrary at trial, as corroborated by various forms of documentary evidence. As noted by the district court, "[Bazazpour] testified that his insurance forms reported no losses when, in fact, he did incur losses due to fire." He also denied during his trial testimony that he had tried to convince Frank Tenney not to speak with federal investigators.

Nevertheless, not every false statement made by a criminal defendant at trial necessarily qualifies as perjury. As the United States Supreme Court has noted:

> In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the

> federal criminal perjury statute, 18 U.S.C. § 1621.  A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a *material matter* with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.

*United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (emphasis added).  The Court also held that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out."  *Id.* at 95.

Interpreting and applying *Dunnigan*, we have imposed a two-step requirement on a district court when it seeks to enhance a sentence for obstruction of justice based upon perjury:  "first, it must identify those particular portions of the defendant's testimony that it considers to be perjurious, and second, it must 'either make specific findings for each element of perjury or at least make a finding "that encompasses all of the factual predicates for a finding of perjury."'"  *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997) (citations omitted).  We have also noted, however:

> [W]he[n] the defendant's testimony appears to be "pervasively perjurious," the district court is not obligated to recite the perjury line by line, so long as its findings encompass the factual predicates necessary for a finding of perjury; in such cases, there is no danger that an enhancement will be imposed solely because the defendant exercised his right to testify . . . .

*Id.*

Despite the fact that the government directs our attention to trial testimony of various witnesses and to documentary exhibits that contradict statements made at trial by Bazazpour, as an appellate court we are not in a position to determine whether the latter constitute perjury under *Dunnigan* and, therefore, whether an enhancement for obstruction of justice should apply in this case.  In its initial explanation for application of the enhancement, the district court clearly relied upon incidents that the Guidelines exclude from a sentencing calculation.  Although the government would, nevertheless,

have us affirm the imposition of the enhanced sentence because of its belief that the defendant offered perjured testimony, the district court did not explicitly rely upon false testimony by Bazazpour in arriving at the sentence imposed. Even if the district court had done so, we would be forced to seek additional information from the district judge, because the district court has not yet determined explicitly whether Bazazpour gave "false testimony *concerning a material matter* with the *willful intent to provide false testimony*, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94 (emphasis added). Consequently, the district court has not yet made, as required by *Sassanelli*, "a finding that encompasses all of the factual predicates for a finding of perjury." 118 F.3d at 501 (internal quotation marks and citations omitted).

## CONCLUSION

For the reasons set out above, we AFFIRM the defendant's convictions but VACATE the sentence imposed and REMAND this matter to the district court for findings necessary to determine whether an obstruction-of-justice enhancement is proper in this case, in light of existing Supreme Court and Sixth Circuit precedent and the provisions of § 3C1.1 of the Guidelines.