RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ALEX ALBERTO CASTRO (19-1166); DANTE ANDRE
HOWARD (19-1292); SOLON TATUM (19-1422),

*Defendants-Appellants*.

Nos. 19-1166/1292/1422

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cr-00193-1—Robert J. Jonker, District Judge.

Argued: May 5, 2020

Decided and Filed: June 3, 2020

Before: MERRITT, SUHRHEINRICH, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Martin J. Beres, Clinton Township, Michigan, for Appellant in 19-1292. Joseph A. Almeida, Steubenville, Ohio, for Appellant in 19-1422. Stephen P. Baker, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Martin J. Beres, Clinton Township, Michigan, for Appellant in 19-1292. Joseph A. Almeida, Steubenville, Ohio, for Appellant in 19-1422. Nathan A. Ray, Akron, Ohio, for Appellant in 19-1166. Stephen P. Baker, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge.

A jury convicted Defendants-Appellants Alex Castro, Dante Howard, and Solon Tatum of conspiring to distribute heroin, cocaine, and marijuana in western Michigan. The evidence at trial depicted a sophisticated drug trafficking organization, with the conspirators going to great lengths to avoid detection. Appellants challenge the tools the government used to ensnare members of the organization, including wiretaps that recorded drug-related conversations between co-conspirators. Because the district court properly authorized those wiretaps, properly admitted evidence obtained from them, properly concluded that the evidence offered by the government supported Appellants' convictions, and properly sentenced Appellants, we affirm.

**I.**

**A.**

In the spring of 2017, DEA agents in Grand Rapids, Michigan, began investigating a drug trafficking ring led by brothers Yusef Phillips and Ray Anthony Lee. Confidential sources told them that Phillips and Lee bought and sold kilogram-level quantities of heroin and cocaine in Grand Rapids, Benton Harbor and Kalamazoo. The investigators gathered evidence against Phillips and Lee, conducting surveillance of them moving packages into and out of two "stash house" locations, recovering drug related products from "trash pulls" at those locations, and making "controlled buys" of drugs from their associates. The agents also observed activity that led them to believe that Phillips and Lee got their drugs from interstate semi-truck shipments. For example, at 4:00 a.m. on July 17, 2017, agents followed Ray Lee's car to a hotel parking lot, where he and Phillips parked near a semi-truck and interacted with the driver. After the meet-up, Phillips and Lee returned to one of the suspected stash houses.

Based on that evidence, the agents obtained authorization to tap Phillips's and Lee's cell phones. They began monitoring Lee's phone ("Target Phone 3") on July 20, 2017 and began

monitoring Phillips's phone ("Target Phone 4") on July 27, 2017. Subsequently, they gained authorization to monitor two more phones owned by Lee and one more phone owned by Phillips. The agents monitored those phones until Phillips and Lee were arrested on September 3, 2017. With the assistance of those wiretaps, the government observed Phillips and Lee arrange additional semi-truck shipments of drugs from their supplier on July 31 and September 3, 2017.

On September 3, 2017, the government arrested 17 members of the alleged drug conspiracy and executed 20 search warrants, uncovering approximately $1,300,000, 13 kilograms of cocaine, 19 kilograms of heroin, 1.5 kilograms of fentanyl, 50 pounds of marijuana, three handguns, and an assault rifle. Phillips and Lee cooperated with the government and described the scope of their drug trafficking organization. The investigation produced evidence against each of the Appellants, which is summarized below.

Appellant Alex Castro. Phillips testified that, starting in late 2013 or early 2014, Castro sold him heroin, cocaine, and marijuana in kilogram-level quantities. According to Phillips, Castro supplied drugs to him and Lee about once per month until the arrests in September of 2017.

Castro used long-haul truck drivers to move drugs from California to Grand Rapids. Federal agents observed three of these deliveries at a Grand Rapids hotel in the summer of 2017. On September 3, 2017, the agents arrested the truck driver, Salvador Cervantes, who agreed to cooperate with the investigation. Cervantes testified that Castro recruited him to carry drugs in his semi-truck and paid him $1,000 per kilogram delivered over the course of several years.

At trial, the government introduced text messages and recorded conversations between Phillips and Castro that were obtained from the wiretaps on Phillips's cell phone. Phillips testified that he and Castro were discussing drug transactions, including price, quantity, quality, and delivery instructions. Phillips also stated that he and Castro communicated in code to avoid detection, referring to kilograms of heroin as "originals," kilograms of cocaine as "chicas," and thousands of dollars of drug proceeds as "the count." Phillips, Lee, and Cervantes all identified Castro as the speaker on the calls admitted at trial.

Appellant Dante Howard.  Phillips testified that he sold cocaine, heroin and marijuana to Dante Howard from late 2016 or early 2017 until September of 2017.  Phillips explained that he delivered drugs to Howard through intermediaries, including an individual named Etrevion Murphy, who carried drugs from Grand Rapids to Benton Harbor on the Greyhound bus.

The government introduced calls and texts between Phillips and Howard to corroborate Phillips's testimony.  Although the two spoke in vague terms, such as "[l]et's make that happen the same way," Phillips testified that they were talking about drugs.  Phillips and Howard also shared their concerns about being detected by police, like when Phillips told Howard that one of their couriers suspected she had been surveilled while driving drug money from Benton Harbor to Chicago.  Howard stipulated that he was the speaker on the phone calls.

Appellant Solon Tatum.  Ray Lee testified that Solon Tatum, whom he knew as "Solo," was his barber.  Lee testified that he sold Tatum two kilograms of cocaine in July of 2017.  The government introduced evidence that Lee sold Tatum the first kilogram in a motel parking lot on July 14, 2017.  Lee testified that on July 18, 2017 he and Tatum met in a mall parking lot, where he delivered another kilogram of cocaine to Tatum and Tatum paid him for the kilogram delivered on July 14.  The government offered video surveillance and recorded conversations to corroborate Lee's testimony.  Tatum stipulated that he was the speaker in those communications.

The government also offered evidence that Tatum intended to sell the cocaine he got from Ray Lee.  Government witness Derrick Swain testified that he purchased cocaine from Tatum on two or three different occasions in late 2016, amounting to a "couple ounces."

**B.**

The government charged Appellants for their alleged involvement in Phillips and Lee's organization.

The jury found Castro guilty of conspiring to distribute over one kilogram of heroin, over five kilograms of cocaine, and less than 50 kilograms of marijuana.  During sentencing, the district court applied a two-level enhancement for obstruction of justice based on Castro's visit to the family of Salvador Cervantes and Castro's efforts to gather information about the

cooperating witnesses while in pretrial custody. Castro's offense level was 46, but capped at 43, the highest possible offense level. Accordingly, it would have been 43 even if the obstruction enhancement had not been applied. Based on Castro's criminal history category of VI, his Sentencing Guideline range was life in prison. The court imposed a sentence of 504 months, to be followed by 24 months for a pending supervised release violation.

The jury found Howard guilty of conspiracy to distribute controlled substances. At sentencing, the district court attributed to Howard one kilogram of cocaine and 800 grams of heroin, resulting in a "converted drug weight" of 1000 kilograms and an offense level of 28. The district court also added one point to Howard's criminal history score based on a misdemeanor use-of-marijuana conviction in 2017. With an offense level of 28 and a criminal history category of III, Howard's Sentencing Guideline range was 97 to 121 months. Citing Howard's extensive criminal record, the court sentenced him to 120 months.

The jury found Tatum guilty of the conspiracy charge (Count 1), not guilty of possessing with intent to distribute cocaine on July 14, 2017 (Count 2), and guilty of possessing with intent to distribute cocaine on July 18, 2017 (Count 3). Tatum represented himself at his sentencing, having discharged his trial counsel. The district court determined that Tatum testified falsely at trial and on that basis applied a two-level enhancement to Tatum's offense level. With an offense level of 26 and a criminal history category of III, Tatum faced a Guideline range of 78 to 97 months in prison. The district court sentenced him to 84 months.

Castro, Howard, and Tatum now appeal their convictions and sentences.

**II.**

As noted above, the issues on appeal fall into four general categories: first, whether the district court erred by admitting evidence obtained from wiretaps; second, whether the government offered sufficient evidence; third, whether the district court erred by admitting out-of-court statements of co-conspirators; and fourth, whether the district court properly sentenced the Appellants.

**A.**

Appellant Castro argues that the district court should have suppressed the evidence obtained from wiretaps of Phillips's cell phones because the government failed to establish that those wiretaps were necessary as required by the federal statute governing interception of wire and electronic communications.

To use a wiretap, federal law enforcement officials must describe to an authorizing judge "whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This "necessity requirement" ensures that wiretapping "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974)).

Even so, "the purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). Accordingly, we give "considerable discretion" to a district court's finding that the requirements of § 2518(1)(c) have been met. *Landmesser*, 553 F.2d at 20.

The government met that standard in this case. In a sixty-page affidavit in support of an application to monitor Phillips's cell phone, DEA special agent Alexis Giudice explained the goals of the investigation and why wiretaps were necessary to achieve those goals. Agent Giudice stated that her team intended to uncover "the identities and roles of all suppliers of controlled substances to the [Phillips-Lee organization]" and to "[o]btain[] admissible evidence that demonstrates beyond a reasonable doubt that the TARGET SUBJECTS and any later identified targets committed the alleged violations of law set forth herein." She went on to explain why traditional investigative techniques were either unlikely to succeed or too dangerous to attempt. For example, physical surveillance was not likely to uncover the supplier because the

known suspects demonstrated "surveillance consciousness," an awareness of when they were being watched and the use of evasive measures to avoid detection.  In addition, none of the government's confidential sources knew who supplied heroin and cocaine to Phillips and Lee, and Agent Giudice considered it unlikely that Phillips and Lee would reveal their source to an undercover agent.  Similarly, Agent Giudice doubted that Phillips and Lee would simply identify their supplier once they were in government custody.  In her experience, "without evidence of criminal wrongdoing, members of criminal organizations are more likely to honor their commitment to the organization (i.e., to not cooperate with law enforcement) over their personal responsibility to provide truthful information to law enforcement officers."

The district court granted that application (as well as subsequent applications for additional phones) and authorized the government to monitor Phillips's and Lee's cell phones from July 27, 2017 until they were arrested on September 3, 2017.  During that time, the government heard Phillips discuss incoming shipments of heroin and cocaine with a person whose voice was later identified as Castro's.

Castro moved to suppress the wiretap evidence, arguing that the government did not need to tap Phillips's cell phones because, by the time the government applied for authorization of those wiretaps, traditional investigation methods had uncovered substantial evidence against 26 members of the Phillips-Lee organization.

However, nothing requires the government to call off its investigation after it achieves only some of its goals.  *See United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) (noting that "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance").  And when the agents intercepted Castro's communications with Phillips, they had yet to meet an important goal of their investigation: identifying and prosecuting the person supplying drugs to Phillips and Lee.  The district court denied Castro's motion for that reason, noting that "the government's goals included trying to identify the source of supply," and emphasizing that even though the government "could have taken down the organization to the extent they understood it at the time [of the wiretap application], it's an inherently balanced decision point" because "once you take

down the people you already know, everybody else is on notice and the higher reaches of the organization are going to shut down or change their tactic long enough to avoid detection."

For these reasons, the district court properly denied Castro's motion to suppress the wiretap evidence.

**B.**

Appellants Howard and Tatum argue that the government failed to introduce sufficient evidence to support their convictions.

"A defendant challenging the sufficiency of the evidence 'bears a very heavy burden.'" *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) (quoting *United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir. 1994)). This court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Court will not reverse a conviction unless, "viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991).

**1.**

The jury convicted Howard of conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, as charged in Count I of the second superseding indictment.

To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must prove: (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy. *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citing *United States v. Welch*, 97 F.3d 142, 148–49 (6th Cir. 1996)). "In a drug distribution chain conspiracy, it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *Id.* at 332–33 (citation and internal quotation marks omitted).

The government offered sufficient evidence to support Howard's conspiracy conviction. Phillips testified that, about once per month from late 2016 through September of 2017, he sold large quantities of drugs (up to one kilogram of cocaine and up to 100 grams of heroin) to Howard. In addition, Phillips and Howard used code words to arrange deals, and they used intermediaries for delivery and payment. Finally, on at least one occasion, Phillips discussed with Howard that one of their associates believed she had been surveilled by police, demonstrating a joint concern to avoid detection. The government corroborated much of this testimony with recorded conversations between Phillips and Howard.

Howard argues that the government's evidence fails to support a conspiracy conviction because he "at most had a buyer-seller relationship with Mr. Phillips and was not a part of his DTO [i.e., drug trafficking organization] or a coconspirator." "Generally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy because 'mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy.'" *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009) (quoting *United States v. Cole*, 59 F. App'x 696, 699 (6th Cir. 2003)). To determine whether a defendant was a coconspirator as opposed to a mere buyer or seller, this court considers "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller." *Id.* at 681 (citing *Cole*, 59 F. App'x at 700). In addition, "evidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (citing *United States v. MacLloyd*, 526 F. App'x 434, 439 (6th Cir. 2013)).

The evidence discussed above permitted a reasonable juror to conclude that Howard participated in the conspiracy. Phillips's testimony alone gave the jury a basis to conclude that Howard purchased large quantities of drugs on a regular basis, through an established procedure, and with joint efforts to avoid being detected.

**2.**

The jury convicted Tatum of conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, as charged in Count 1 of the second

superseding indictment.  The jury also found Tatum guilty of possessing cocaine on July 18, 2017 with intent to distribute, as charged in Count 3 of the second superseding indictment.

To convict Tatum on the conspiracy count, the government had to meet the burden set forth above with reference to the same charge against Howard.  At trial, the government offered substantial evidence against Tatum, the most significant of which was the testimony of Ray Lee.  Lee testified that he sold Tatum a kilogram of cocaine on two different occasions in the summer of 2017.  On both occasions, Lee "fronted" the drugs to Tatum, meaning that he trusted Tatum to pay for the $35,000 worth of cocaine at a later date.  Lee also testified that he gave Tatum two samples of heroin, one that had been diluted (or "touched," according to the communications between Lee and Tatum) and one that was uncut, so that a potential customer could test their quality.  The government offered recorded conversations and video surveillance footage that corresponded to much of Lee's testimony.

That evidence supports Tatum's conspiracy conviction.  Tatum purchased large quantities of cocaine on a fronted basis.  This Court has "recognized that the trust involved in fronting drugs under a delayed payment or credit arrangement suggests more than a buyer-seller arrangement between the parties."  *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004).  Moreover, Lee and Tatum discussed the quality of different batches of heroin, which suggested a level of coordination beyond the typical buyer-seller arrangement.

Tatum also challenges his conviction for possession of cocaine with intent to distribute on July 18, 2017 (Count 3).  To prove possession with intent to distribute, the government must establish that the defendant: "(1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it."  *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010) (quoting *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006)).

The government offered sufficient evidence to sustain this conviction as well.  First, Lee testified that he sold Tatum a kilogram of cocaine on two occasions.  This court has held that possession of one kilogram of cocaine "permits an inference that the cocaine was intended for distribution, not personal use."  *United States v. Martin*, 920 F.2d 345, 348 (6th Cir. 1990) (citing *United States v. Franklin*, 728 F.2d 994, 998 (8th Cir. 1984)).  In addition, government

witness Derrick Swain testified that Tatum sold him "a couple ounces" of cocaine on two or three occasions beginning in late 2016.

Tatum argues that the government failed to prove that he intended to distribute the cocaine he possessed on July 18, 2017 because the prosecution offered no evidence that he actually sold drugs after that date. That argument wrongly equates intent to distribute with actual distribution and ignores that intent can be proved through circumstantial evidence. Tatum's possession of large amounts of cocaine and prior sales of cocaine to Swain permitted the jury to find that he intended to sell the cocaine he possessed on July 18, 2017.

## C.

Howard challenges the admission of three recorded phone calls between Yusef Phillips and Etrevion Murphy, which the government alleged to contain discussions of a drug transaction between Phillips and Howard.

Howard argued at trial that these recordings were hearsay. A statement made out of court and offered to prove the truth of the matter asserted in the statement is hearsay. Fed. R. Evid. 801. But an out-of-court statement offered against an opposing party is not hearsay when it is "made by the [opposing] party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "[I]f it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible." *United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978). That determination is made by the court under Federal Rule of Evidence 104(a). *Id.*

The district court denied Howard's hearsay objection, determining that the calls between Phillips and Murphy met the coconspirator exception to the hearsay rule. The court conditioned that ruling on a determination at the conclusion of the government's evidence that Howard was a coconspirator of Phillips and Murphy, and the court ultimately made that finding by a preponderance of the evidence.

Howard argues that the calls between Phillips and Murphy fell outside of the coconspirator exception because he "was not proven to be a conspirator" of Phillips and Murphy. However, as summarized above in connection with Howard's sufficiency-of-evidence argument, the district court had an ample basis to conclude that Howard was a coconspirator of Phillips and Murphy. Accordingly, the district court did not err in admitting the recordings under Rule 801(d)(2)(E).

**D.**

Each Appellant challenges his sentence. For the reasons below, the district court properly sentenced the Appellants.

**1.**

Appellant Castro argues that the district court erred by finding that he attempted to influence witnesses, which resulted in a two-level enhancement for obstruction under USSG § 3C1.1. However, even without the obstruction enhancement, Castro's offense level would have been 43 (the maximum under the Sentencing Guidelines). Castro concedes that point. Accordingly, even if the district court erred in applying the enhancement, that error would not have affected Castro's offense level or Guideline range and was therefore harmless. *See United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019) ("Errors that do not affect the ultimate Guidelines range or sentence imposed are harmless and do not require resentencing.") (citing *United States v. Morrison*, 852 F.3d 488, 491–92 (6th Cir. 2017)).

Moreover, we note that the district court had a sufficient basis to conclude that Castro attempted to influence witnesses.[1] Before Castro was indicted, he visited the wife of his driver, Salvador Cervantes, who had been arrested on September 3, 2017. The district court noted that

---

[1]As this court noted in *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019), previous panels have applied several different standards of review to this question. Some panels considered the application of facts to § 3C1.1 to be a mixed question of law and fact that we review de novo. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018); *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012). A different panel, noting that 18 U.S.C. § 3742(e) directs appellate courts to "give due deference to the district court's application of the guidelines to the facts," applied clear-error review. *United States v. Jackson-Randolph*, 282 F.3d 369, 388–90 (6th Cir. 2002). Yet another panel used elements of both standards, stating that courts should review de novo "whether facts constitute obstruction of justice," but also should "give due deference to the district court's application of the guideline to the facts." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citations omitted). We do not attempt to resolve that discrepancy in this opinion.

this visit was "neutral on its face or even helpful," made seemingly to say, "Hey, I'm here for you." However, the court held that the more logical interpretation was that Castro was "encourag[ing] Mr. Cervantes not to come clean or to lean in Mr. Castro's favor" with the implication that he could "make things miserable," which was "at least enough of a concern for Mrs. Cervantes to move her family" before Cervantes pleaded guilty. Lending support to that interpretation, the government noted that Cervantes was afraid to testify against Castro and nearly backed out of his agreement to cooperate.

Accordingly, we affirm Castro's sentence.

**2.**

Appellant Howard contends that the district court committed three errors in devising his sentence: (1) finding that Howard was responsible for one kilogram of cocaine and 800 grams of heroin, when the jury determined that he was responsible for less than 500 grams of cocaine and no heroin; (2) concluding that Howard's prior conviction for marijuana use should score as a separate offense rather than conduct relevant to his felony drug conviction; and (3) placing too much weight on Howard's criminal history in sentencing him to 120 months in prison.

Drug Quantity. The district court did not err in determining the quantity of drugs attributable to Howard.

Howard first argues that the district judge erred by finding him responsible for more drugs than the jury did. However, a sentencing judge may find (by a preponderance of the evidence) that a defendant is responsible for a greater quantity of drugs than determined by the jury (applying the higher beyond-a-reasonable-doubt standard). *See United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam) (holding that a sentencing judge may consider acquitted conduct when devising a sentence); *United States v. White*, 551 F.3d 381, 384–85 (6th Cir. 2008) (en banc) (same). Because the quantity of drugs that the district court attributed to Howard did not expose him to a greater sentence than the maximum under his statute of conviction, the court was permitted to determine that quantity based on a preponderance of the evidence. *See United States v. Williams,* 29 F. App'x 198, 202 (6th Cir. 2001) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Second, the district court cited ample evidence for attributing one kilogram of cocaine and 800 grams of heroin to Howard.  This court reviews that determination for clear error. *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998) (citing *United States v. Thomas*, 49 F.3d 253, 259 (6th Cir. 1995)).

Phillips (whom the district court regarded as a credible witness) testified that he sold Howard up to a kilogram of cocaine and up to 100 grams of heroin each month from the end of 2016 until they were both arrested in September of 2017.  The district court accounted for some uncertainty in those numbers, noting that the 1000 kg of "converted drug weight"[2] fell "right on the cusp between level of offense 30 and level of offense 28," and erred on the side of caution in setting Howard's offense level at 28.  Accordingly, the district court's determination was not clearly erroneous.

Prior Marijuana Conviction.  The district court properly determined that Howard's prior misdemeanor conviction for "use of marijuana" should be scored as one criminal history point instead of factoring into the "relevant conduct" of his conspiracy conviction.

A sentencing court must properly calculate the defendant's Sentencing Guidelines range. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).  This court reviews that issue for abuse of discretion, "keeping in mind that factual findings will stand unless clearly erroneous and legal conclusions will stand unless our fresh review leads to a contrary conclusion." *Id.* (citing *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007)).

Section 4A1.1 of the Sentencing Guidelines directs a sentencing court to determine a defendant's criminal history score by adding points for prior sentences.  A "prior sentence" is "any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." *Id.* § 4A1.2(a)(1).  Conduct is "part of the instant offense" when it would be considered "relevant conduct" under section 1B1.3 of the Guidelines. *Id.* § 4A1.2 cmt. n.1.

---

[2]One gram of heroin equals 1000 grams of "converted drug weight," and one gram of cocaine equals 200 grams of that measurement.  USSG § 2D1.1, cmt. 8 ("Use of Drug Conversion Tables").

The district court found that Howard's personal use of marijuana fell outside of the relevant conduct of his conviction in this case for conspiracy to possess with intent to distribute controlled substances. In support, the court explained that "use of marijuana is distinct from possession with intent to distribute" because "it's certainly conceivable that somebody can be involved in the use of marijuana or other drug[s] without having it be part of the conspiracy to distribute."

Circuit precedent supports the district judge's analysis. In *United States v. Collins*, this court upheld a sentencing judge's determination that the defendant's possession of heroin for personal use was not relevant conduct with respect to his conviction for conspiracy to distribute. 600 F. App'x 433, 438 (6th Cir. 2015). Similarly, in *United States v. Escobar*, this court held that possession of small amounts of cocaine for personal use fell outside of the defendant's conviction for conspiracy to possess with intent to distribute cocaine. 992 F.2d 87, 90 (6th Cir. 1993) ("We can think of no justification for concluding that *any* cocaine possession by Escobar during the three-year time span of the criminal enterprise must automatically be considered as having been committed by him as part of or in furtherance of his criminal enterprise.").

Accordingly, the district court properly determined that Howard's misdemeanor conviction for use of marijuana should be scored as a separate prior offense.

Weight given to Criminal History. Finally, Howard asserts that the district court placed undue weight on his criminal history in sentencing him to 120 months in prison (which fell within, but near the top of, the Sentencing Guideline range of 97 to 121 months).

A claim that a sentence is substantively unreasonable is "a complaint that the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *Rayyan*, 885 F.3d at 442. Weighing those factors "is a matter of reasoned discretion, not math, and our highly deferential review of a district court's sentencing decisions reflects as much." *Id.* (citing *Gall*, 552 U.S. at 51). This court presumes that a sentence within the Guidelines range is reasonable. *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc).

Howard fails to rebut the presumption that his within-guideline sentence was reasonable. The district court explained why Howard's criminal history warranted a sentence near the top of the guideline range.  In that connection, the court observed that Howard's criminal history appeared to be "from age 12 on . . . a largely unbroken string of convictions."  The district judge expressed particular concern regarding a conviction for conspiracy to distribute heroin after a jury trial in 2002 and a violation of the terms of supervised release after that conviction.

Howard contends that the district court failed to consider that he "was much less culpable than the other main players in the conspiracy."  But he fails to explain why he should be considered less culpable, and to the extent that argument is based on the quantity of drugs he handled, that factor was accounted for in calculating his offense level.

Accordingly, the district court did not place undue weight on Howard's criminal history.

**3.**

Appellant Tatum asserts that the district court committed three errors in determining his sentence: (1) finding that Tatum perjured himself during his testimony at trial; (2) "double counting" that perjury by considering to be an aggravating factor in the sentencing calculation; and (3) declining to adopt a downward departure in Tatum's criminal-history calculation.

Perjury.  The district court did not err by finding that Tatum's trial testimony constituted perjury and amounted to an obstruction of justice under section 3C1.1 of the Sentencing Guidelines.

That section provides that when a defendant willfully obstructs justice with respect to the investigation, prosecution, or sentencing of his offense of conviction, the sentencing court should increase the defendant's offense level by two.  USSG § 3C1.1.  Obstruction of justice under section 3C1.1 includes testimonial perjury at trial.  *Id.* at cmt. n.4(b).

Importantly, "not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury."  *United States v. Dunnigan*, 507 U.S. 87, 95 (1993).  When a defendant objects to the application of an obstruction enhancement based on his trial testimony, the sentencing court "must identify those particular portions of the

defendant's testimony that it considers to be perjurious," and "must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Roberts*, 919 F.3d 980, 990 (6th Cir. 2019) (quoting *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997)) (internal quotations omitted). Those factual predicates are that (1) the defendant gave false testimony (2) concerning a material matter and (3) with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *Dunnigan*, 507 U.S. at 94.

The transcript of Tatum's sentencing confirms that the district court made sufficient factual findings to conclude that Tatum willfully gave false testimony concerning a material matter. In particular, the district court took issue with Tatum's testimony about "moving razors back and forth . . . and not drugs or cash that was related to drugs." The allusion to "moving razors back and forth" referred to Tatum's farfetched explanation for his interactions with Ray Lee in July and August of 2017, which we summarize below.

Lee testified that on July 14, 2017, he met Tatum in the parking lot of a hotel to deliver a kilogram of cocaine. Lee added that he met Tatum again four days later at a mall parking lot to give Tatum a second kilogram of cocaine and to receive payment for the first kilogram. Lee went on to testify that on August 10, 2017, Tatum met him at the same mall parking lot to pay for the second kilogram.

Tatum provided an entirely different version of these events. Tatum, who is a barber, testified that Lee asked him to fix two pairs of hair clippers that he owned. According to Tatum, Lee dropped off the clippers at the hotel on July 14, and Tatum returned them at the mall on July 18. To explain the August 10 meeting, Tatum stated that, sometime after July 18, Lee came to Tatum's barber shop and said that the clippers still weren't working correctly, so Tatum repaired them again and returned them to Lee on August 10. Twice during his testimony, Tatum stated that he "[n]ever once" received drugs from Lee.

The district court noted that the jury rejected Tatum's story about the hair clippers and stated that he "underst[ood] why," noting that some of Tatum's testimony was "wholly incredible." The district court also concluded that Tatum's testimony was willful and material,

finding that "there was no accident or mistake " about Tatum's testimony and that his interactions with Lee were at "the heart of the case."

Accordingly, the district court properly determined that Tatum obstructed justice by willfully testifying falsely at trial.

Double Counting.   The district court did not err by considering Tatum's perjured testimony at two stages of the sentencing determination because—as the sentencing transcript shows—only once did that factor actually increase Tatum's sentence.

Tatum alleges that the district court "double counted" his perjured testimony by (1) using it as a basis to impose an obstruction enhancement and (2) considering that testimony to be an "aggravating factor" under 18 U.S.C. § 3553(a).   "[I]mpermissible 'double counting' occurs when precisely the same aspect of the defendant's conduct factors into his sentence in two separate ways." *United States v. Moon*, 513 F.3d 527, 542 (6th Cir. 2008) (quoting *United States v. Farrow*, 198 F.3d 179, 195 (6th Cir. 1999)).   Because Tatum did not bring this alleged procedural defect to the district court's attention, we review it for plain error.  *See Vonner*, 516 F.3d at 385.   Under that highly deferential standard, "[a] party who neglects to make an objection, even after being given 'an opportunity' to do so, forfeits the argument and may obtain relief on appeal only if the error is 'plain' and 'affects substantial rights.'"  *Id.* (quoting Fed. R. Crim. P. 52(b)).

The record of Tatum's sentencing shows that the district court relied on Tatum's perjured testimony to increase his sentence only once.   After finding that Tatum obstructed justice by falsely testifying at trial, the district court increased Tatum's offense level by two, resulting in a Sentencing Guideline range of 78 to 97 months.   The court then turned to the question of whether, considering the factors listed in § 3553(a), there was any basis to vary upward or downward from the Guideline range.   The court found no mitigating factors, noting that "I don't hear much from Mr. Tatum nor did I read much from Mr. Tatum about other reasons that might augur in favor of a different sentence."   The court then concluded that a within-guideline sentence of 84 months was "appropriate."   To explain why the within-guideline sentence was

reasonable, the district court again referred to Tatum's perjured testimony, calling it a "serious aggravating factor."

Accordingly, although the district court considered Tatum's perjured testimony at two stages of the sentencing proceeding, nothing in the record suggests that this factor was actually "double counted."

Denial of Downward Departure.  Finally, the district court did not err by declining to reduce Tatum's criminal history score based on two misdemeanor convictions that were nearly ten years old.

As Tatum recognizes, this court "do[es] not review a district court's decision not to depart downward unless the record shows that the district court was unaware of, or did not understand, its discretion to make such a departure." *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008) (citing *United States v. Puckett*, 422 F.3d 340, 344 (6th Cir. 2005)).

As Tatum also recognizes, the district court acknowledged that it had discretion to depart downward in determining his criminal history score, noting that an argument that one's "criminal history category is overstated . . . is always open."  The district court then exercised its discretion to not depart downward.  This court does not review such decisions.

**III.**

For these reasons, we affirm the Appellants' convictions and sentences.