RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

　　　　　　　　　　　*Plaintiff-Appellee*,

　　　*v.*

LEDINSON CHAVEZ,

　　　　　　　　　　　*Defendant-Appellant*.

> No. 19-5016

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:15-cr-00054-5—Rebecca Grady Jennings, District Judge.

Argued:  December 5, 2019

Decided and Filed:  February 21, 2020

Before:  ROGERS, STRANCH, and THAPAR, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  R. Kenyon Meyer, DINSMORE & SHOHL, LLP, Louisville, Kentucky, for
Appellant.  L. Jay Gilbert, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky,
for Appellee.  **ON BRIEF:**  R. Kenyon Meyer, DINSMORE & SHOHL, LLP, Louisville,
Kentucky, for Appellant.  L. Jay Gilbert, UNITED STATES ATTORNEY'S OFFICE,
Louisville, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

THAPAR, Circuit Judge.  Four men from Miami drove to Louisville with a plan to set up
chiropractic clinics.  But Oskel Lezcano (who all agree was the mastermind) had another, more
lucrative idea:  file false claims with the patients' insurers and get paid for treatments that never

happened.  The other men involved—Ledinson Chavez, Sergio Betancourt, and Yuriesky Diaz— joined in.

The plan worked (for a while).  One reason for its success:  aggressive marketing.  The conspirators recruited and paid patients both to come to the clinics and to recruit others.  Many of the patients worked at a shipyard called Jeffboat.  Jeffboat (through its claim administrator, United Healthcare) paid the clinics more than $1 million for fake injections of a muscle relaxant.

Eventually, the government discovered the scheme and brought criminal charges against the four men.  Chavez went to trial.  He claimed that he was innocent and had no idea that Lezcano was cooking the books.  But to no avail.  The jury found Chavez guilty of healthcare fraud, conspiracy to commit healthcare fraud, aggravated identity theft, and conspiracy to commit money laundering for purposes of concealment.

Chavez now appeals those convictions and his 74-month sentence.  He alleges a host of trial errors, which fall into three groups:  (1) two challenges to the sufficiency of the evidence and a related challenge to the prosecutor's closing argument, (2) two hearsay arguments, and (3) three objections to the jury instructions.  He also raises one sentencing argument.  We affirm.

I.

A.

*Sufficiency of the Evidence:  Aggravated Identity Theft.*  Chavez argues the evidence was insufficient to find him guilty of aggravated identity theft.  For this challenge, we take the evidence in the light most favorable to the government and ask whether any rational trier of fact could have convicted on the count. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To prove aggravated identity theft, the government had to show that Chavez knowingly and without authority transferred, possessed, or used someone else's personal identification while committing another crime enumerated in the statute (here, healthcare fraud and conspiracy).  18 U.S.C. § 1028A(a)(1).  The jury found that the government carried its burden. That finding was rational based on everything the jury heard and saw.

During the conspiracy, the clinics asked United Healthcare to make them approved out-of-network providers. To that end, the clinics sent in applications with identifying documents (driver's license, Social Security card, and chiropractic license) for the chiropractors who allegedly worked at the clinics. One application packet, submitted on behalf of a clinic called Ledic Therapy Group, included the documents of chiropractor Todd Black. But Black testified that he had never heard of Ledic Therapy Group, never worked there, and never authorized the clinic to use his information.

That's the identity theft Chavez was charged with: knowingly using Black's documents, without his permission, in the Ledic application. The evidence was sufficient to convict him. The Ledic packet didn't just contain Black's identifying documents. It also had Chavez's driver's license and his Social Security number. And the documents' cover sheet purported to be signed by Chavez (with a signature that resembled the one on his driver's license). A reasonable jury could have taken those documents at face value—particularly with no evidence to the contrary.

True, Chavez tried to exclude the Ledic documents from evidence and, after that failed, asked that the jury be told not to consider his name on the documents. But the district court admitted them in full. And when we analyze the sufficiency of the evidence, we look at all the evidence admitted. *See Lockhart v. Nelson*, 488 U.S. 33, 40–42 (1988); *United States v. Quinn*, 901 F.2d 522, 530–31 (6th Cir. 1990).

Chavez also argues that even if he submitted the documents, the evidence didn't prove that he *knew* Black hadn't authorized their use. Chavez points out that Black had done work at other Lezcano-affiliated clinics and routinely provided his documentation for administrative purposes. But there's no reason to think anyone (Chavez included) would have understood Black's consent for some uses to extend to *all* uses—including the Ledic application. Again, Black testified that he never worked at Ledic, never authorized his information to be used for Ledic's benefit, and had never even heard of Ledic until this case.

Of course, it's *conceivable* that Chavez somehow made an honest mistake about whether he had permission to use Black's credentials. But the jury was entitled to think of that possibility

(if at all) as a mere "fanciful conjecture," not a reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 20 (1994). Particularly since there was no evidence to support that conjecture.

B.

*Sufficiency of the Evidence: Conspiracy to Commit Concealment Money Laundering.* Chavez also argues that the government failed to prove he conspired to commit concealment money laundering. To prove concealment money laundering, the government had to show (1) that a person conducted a financial transaction (2) that involved the proceeds of unlawful activities, (3) that he knew involved some illegal proceeds, and (4) that he knew was "designed" (at least in part) to conceal or disguise certain facts about the proceeds. 18 U.S.C. § 1956(a)(1), (a)(1)(B)(i); *see Cuellar v. United States*, 553 U.S. 550, 563–67 (2008). And to prove conspiracy, the government had to show that the defendant knowingly agreed with someone else to commit this crime. *United States v. Bazazpour*, 690 F.3d 796, 802 (6th Cir. 2012). The jury found the government carried its burden. Again, that finding was rational.

Why? Because for at least some clinics, the conspirators created duplicate business entities with identical names (one in Kentucky, one in Florida) and opened parallel bank accounts for those entities. The chiropractors at the clinics would have access to one set of accounts. The conspirators used the duplicate accounts to store the proceeds of their healthcare scheme and to pay themselves. The chiropractors never saw these duplicate accounts.

Chavez doesn't argue that the government failed to prove his knowledge of these accounts or his agreement to deposit illegal proceeds in them. (In fact, he personally opened some of them.) And the jury easily could have inferred a concealment purpose behind these parallel accounts. If the chiropractors had found out how much money the clinics were moving, they might have started to ask inconvenient questions. So a rational juror could infer that the conspirators opened the accounts to conceal their fraudulent-billing scheme from the chiropractors by using bank accounts the chiropractors could not monitor.

Even so, Chavez says that it would have made no sense to conceal funds by depositing them in a bank account with his own name on it. But the jury didn't have to find that the conspirators wanted to hide this money from the *whole world*. It could just find that they wanted

to hide it from the *chiropractors*. That satisfies the statute, which (1) demands only a partial purpose of concealment; (2) covers efforts to conceal the funds' "nature," "location," "source," "ownership," or "control"; and (3) doesn't specify *from whom* the transaction must be designed to conceal those attributes. 18 U.S.C. § 1956(a)(1)(B)(i); *see also Cuellar*, 553 U.S. at 559 (noting that "nature" refers to "the funds' illegitimate character").

Chavez also challenges the *timing* of the money-laundering offense. By definition, money laundering involves the "proceeds" of illegal activity. 18 U.S.C. § 1956(a)(1). That implies that you can't commit money laundering unless some other crime has *already* been committed (though not necessarily *completed* since it could be a continuing offense). *See United States v. Santos*, 553 U.S. 507, 511 (2008) (plurality opinion); *United States v. Kerley*, 784 F.3d 327, 344–45 (6th Cir. 2015). Chavez says that depositing United Healthcare checks in the bank accounts was a necessary step in the healthcare fraud. Thus, he reasons, those funds were not "proceeds" and the deposits couldn't constitute money laundering. The conclusion follows from the premise. But the premise is wrong.

That's because the law Chavez was convicted under "prohibit[s] the 'scheme to defraud,' rather than the completed fraud." *Neder v. United States*, 527 U.S. 1, 25 (1999); *see* 18 U.S.C. § 1347(a). Thus, the crime was committed the moment the conspirators submitted false claims for payment. Under a "scheme to defraud" statute, liability doesn't wait to attach until *after* the victim falls for the ruse and cuts a check. *See United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006). Much less until after the fraudster *deposits* that check. *See Kerley*, 784 F.3d at 344–45. So there's no timing problem with Chavez's conviction.

## C.

*The Government's Closing Argument.* Even if the *evidence* was sufficient to prove a concealment scheme distinct from the fraud scheme, Chavez argues that the government's *closing argument* improperly equated the two.

Chavez didn't object at the time, so we review for plain error. *See United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). The word "plain" has teeth: it means an error so obvious that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance." *United States v. Frady*, 456 U.S. 152, 163 (1982). That didn't happen here.

To be sure, the prosecutor said at one point that "[t]he entire scheme is a concealment." R. 414, Pg. ID 3097. Out of context, that *might* sound like he was trying to blur the distinction between (1) the scheme to commit healthcare fraud and (2) the scheme to launder the *proceeds* of the healthcare fraud. But in context, the prosecutor made the "entire scheme" comment when discussing one element of money laundering: purpose to conceal. He seems to have been arguing that the secrecy of the overall operation (*e.g.*, paying the recruiters in cash) showed that the conspirators had an interest in concealment. If so, that would support an inference that the bank accounts were also designed with a concealment purpose, a necessary element of the crime.

On this reading, there was no error in the closing argument. Since this reading is plausible, we cannot find *plain* error. In any event, Chavez hasn't argued that the alleged error affected his substantial rights—as was his burden. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 734–35 (1993). So if nothing else, his failure to meet that burden rules out a new trial on this ground.

II.

Chavez next challenges the district court's evidentiary rulings. We review evidentiary rulings for an abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). That means that we check whether the district court (1) misunderstood the law (here, the Federal Rules of Evidence), (2) relied on clearly erroneous factual findings, or (3) made a clear error of judgment. *See United States v. Daneshvar*, 925 F.3d 766, 775 (6th Cir. 2019); *United States v. Mack*, 808 F.3d 1074, 1084 (6th Cir. 2015). But even if the district court abused its discretion, we may not grant a new trial if the record gives us a "fair assurance" that the verdict wasn't "substantially swayed" by the evidentiary error. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see* 28 U.S.C. § 2111.

Chavez attacks two pieces of evidence:  (1) a notebook that belonged to Diaz and (2) the Ledic Therapy Group packet Chavez apparently signed.  He argues that the district court erred by admitting the exhibits because they were hearsay (and, in the packet's case, compounded the error by not giving appropriate hearsay limiting instructions).

The basics:  in most cases, an out-of-court assertion (or "statement") is hearsay if it is offered to prove the truth of the matter asserted.  Fed. R. Evid. 801(a), (c).  Hearsay is inadmissible unless it falls within an exception.  Fed. R. Evid. 802, 803, 804, 807.  But some kinds of statements (often called "exclusions") need no exception because they are not considered hearsay in the first place—even when offered for their truth.  Fed. R. Evid. 801(d).

A.

*Diaz's Notebook.*  Diaz had a notebook with jottings that look like the kind of notes anyone might keep about his business—a mishmash of names, addresses, telephone numbers, dollar figures, and other numbers, almost all of it meaningless to an outsider.  Several pages are covered by names sitting atop strings of numbers.  For example:

[First and last name]
16/20/-16-17-18-19-20=>5

On two other pages, Diaz added up what appear to be dollar amounts under the headings "Papo" (Chavez's nickname) and "Mio y Papo."  These two cryptic arithmetic problems are the only references to Chavez in the notebook.

For purposes of hearsay, these notes qualify as "statements."  A "statement" is simply something that its maker intends as an "assert[ion] [of] a proposition that could be true or false." *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009); *see also* Fed. R. Evid. 801(a) & advisory committee's note to subdivision (a) (1972 Proposed Rules).  Diaz surely intended for his notes to record *something* about his business.  That it's hard to say exactly *what* doesn't mean that they weren't "statements."

The harder question is whether the prosecution used the notes to prove the truth of what they asserted. Fed. R. Evid. 801(c)(2). For the most part, the government didn't. And to the extent that it did, any error was harmless. But all this requires more explanation.

Start with the strings of numbers. As the government mentioned in its closing argument, two witnesses testified that these numbers recorded a patient's visits: "16/20" meant a patient had completed sixteen of the twenty appointments needed before he got paid. But that didn't go to the truth of the matters asserted. The government was not trying to figure out whether it was true that the particular patient whose name Diaz wrote had visited the clinic sixteen out of twenty times. The witnesses were simply explaining *what the notes were talking about*, not whether they were *accurate*. If it turned out the notes were wrong—say, if a patient had only been to the clinics six times, not sixteen—that wouldn't have contradicted any testimony or government argument. Simply put, the government didn't care whether it was true that a patient went there sixteen times.

The "Papo" notes call for more focused analysis about two points: (1) the contents of the notes and (2) the fundamentals of hearsay.

As to the first, the simplest way to achieve that clarity is to look at the notes. So here they are in full:

As to the second:  remember that evidence is only hearsay to the extent that it (1) asserts a proposition and (2) is used to prove the truth of that very proposition ("the matter asserted"). Fed. R. Evid. 803(c); *see also, e.g.*, *United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986).

So do the "Papo" notes assert a proposition that they were also used to prove?  And if so, what is that proposition?  Given how cryptic the notes are, those questions are easier asked than answered.  Let's start by ruling some candidates *out*.

It's tempting to think (and Chavez argues) that the notes must be hearsay because (1) they use Chavez's nickname and (2) they were used to link Chavez to the conspiracy.  But that line of thought gets us nowhere.  For starters, the *name* "Papo" can't assert a proposition because, by itself, it's *just* a name.  It identifies a person, but it says nothing *about* that person. In grammatical terms, it's a subject with no predicate.  That isn't a proposition or statement at all.  *Cf. United States v. Snow*, 517 F.2d 441, 442–44 (9th Cir. 1975) (holding that the defendant's name written on a piece of tape was not a statement).

Thus, to identify the matters asserted in the notes, it's not enough just to know that they mention Chavez.  We must also know *what they say about him*.  Unfortunately, no witness explained what the numbers on these two pages stood for or how they were associated with Chavez. (The government asked Betancourt once, but he failed to answer and the government failed to ask again.)

Still, this much is clear:  just as the proposition asserted can't be "Papo," it also can't be "Chavez is a member of the conspiracy."  On one page, the word "Papo" is the heading of a simple addition problem.  On the other, Diaz wrote "18300 Mio y Papo" near some other hard-to-follow calculations.  Unless Diaz wrote in some elaborate numeric code (a theory never floated at trial), these notes don't *assert* that Chavez belongs to the conspiracy.

In the end, the only plausible meaning of the notes is something akin to "Chavez is owed"—or maybe "spent" or "received"—"these amounts of money."  In other words, the only real candidates are propositions about particular financial transactions in which Chavez was asserted to be involved.

Thus, the *only* hearsay use would be if the prosecution used the notes to prove that Chavez was owed, spent, or received the amounts of money listed in the notes. And with only one possible exception, the prosecution never argued that the notes proved any specific fact about Chavez's finances.

What's the possible exception? In closing, the government connected the note "18300 Mio y Papo" with a check Diaz received for $18,300. It then connected that check with the money-laundering charge, implying that Chavez's name next to the check amount was evidence against him on that count. The precise nature of all these connections was hard to follow. But if the government was asking the jury to construe "18300 Mio y Papo" as evidence of a financial transaction in which Chavez was involved, that was indeed a hearsay use. The note *asserted* that Chavez had some connection with the check. And the government was using that assertion to *prove* that Chavez had some connection with the check. That was hearsay.

But any hearsay error was harmless. The government produced voluminous evidence of the conspirators' financial transactions—Chavez's included. Diaz's $18,300 check was no more than one thread in that elaborate tapestry. The other evidence showed that Chavez personally opened at least two bank accounts for the clinics to deposit fraudulent checks and that he personally deposited checks from United Healthcare into those accounts. All told, the idea that the verdict was "substantially swayed" by any hearsay use of the note "18300 Mio y Papo" is implausible. *Kotteakos*, 328 U.S. at 765.

B.

*The Ledic Therapy Group Documents.* The Ledic Therapy Group documents, sent as an application to United Healthcare, included Todd Black's identification without his permission. The cover sheet appeared to be signed by Chavez, whose driver's license and Social Security number were also in the packet. Chavez says the whole packet was inadmissible hearsay and the signature was *double* hearsay, so the district court should have at least redacted it or told the jury not to assume it was genuine.

But this is not a "hearsay within hearsay" fact pattern. *See* Fed. R. Evid. 805. Considered simply as an exhibit, the packet wasn't a statement. It was just physical evidence

relevant (1) to prove that it existed and (2) to corroborate that United Healthcare received it (which was established by testimony).

Of course, there are out-of-court statements *in* the packet. Those statements would be hearsay unless they fell within an exception or exclusion. Chavez is right that the signature on the cover sheet is such a statement. True, a name *alone* isn't a statement. But the signature on the cover sheet conveys something more—it asserts "I am Ledinson Chavez and I am responsible for these documents." *See* Fed. R. Evid. 801(a); *United States v. Vigneau*, 187 F.3d 70, 74 (1st Cir. 1999). Still, that's single-level hearsay at most—there's no double hearsay. Thus, this evidence needs only one layer of exceptions or exclusions to be admissible.

Two exclusions together did the job. How so? The district court found that *either* Chavez signed his name *or* one of his co-conspirators signed it to promote their shared goal of committing healthcare fraud. Either way, the signature wasn't hearsay. A party's own statements aren't hearsay when offered against him. Fed. R. Evid. 801(d)(2)(A). Nor are statements his co-conspirators made during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). That takes care of Chavez's hearsay argument.[1]

### III.

Chavez next attacks the district court's jury instructions. He contends that (1) the court's instruction on aiding and abetting aggravated identity theft was deficient, (2) it was unfair for the jury instructions to quote the text of each count as charged in the indictment, and (3) the court erred by not giving a multiple-conspiracies instruction.

The district court has "broad discretion in drafting jury instructions." *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001). To overcome that discretion, Chavez must show that

---

[1]In passing, Chavez suggests that if a co-conspirator signed his name, that wouldn't be enough to connect him to the documents. But that isn't a hearsay argument. If it's an evidentiary argument at all, it's a relevance argument Chavez has likely forfeited by burying it within his hearsay discussion. *See, e.g.*, *United States v. Taylor*, 800 F.3d 701, 715 (6th Cir. 2015); *Salkil v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520, 531 (6th Cir. 2006); s*ee also generally Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–82 (11th Cir. 2014) (discussing this and other ways parties can fail to raise issues for review). Even if Chavez properly raised a Rule 401 relevance argument to the signature, the argument would fail because relevance is an "extremely liberal" test satisfied by "even the slightest probative worth." *Douglas v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992), *abrogated on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440 (2000).

the "instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Pensyl*, 387 F.3d 456, 458 (6th Cir. 2004) (cleaned up). That's a high bar. Chavez can't clear it.

## A.

*Aiding and Abetting.* The district court told the jury that it could find Chavez guilty of aggravated identity theft in either of two ways: if he personally committed that crime or if he aided and abetted its commission. Chavez argues that the court erred when it gave the latter instruction. Why? Because (he says) the court didn't instruct that to convict Chavez as an aider and abettor, the government had to prove his "advance knowledge" of the identity theft.

That language comes from *Rosemond v. United States*, a case about aiding-and-abetting liability for the layered (or "compound") offense of using or carrying a firearm while committing certain violent or drug-related crimes. 572 U.S. 65, 67 (2014); *see* 18 U.S.C. § 924(c)(1)(A). In *Rosemond*, the Supreme Court applied basic complicity principles to hold that you don't automatically aid and abet a § 924(c) violation just because you intentionally assist the *underlying* crime. 572 U.S. at 76. Instead, you must intend to assist the § 924(c) violation itself—gun use included. *Id.* In the Court's words, "the intent must go to the specific and entire crime" for which you're charged as an aider and abettor. *Id.* In a § 924(c) case, that requirement is met if you "actively participated in the underlying crime with *advance knowledge* that a confederate would use or carry a gun during [its] commission." *Id.* at 67 (emphasis added).

Chavez didn't raise this *Rosemond* issue at trial, so again we review for plain error. And again, there was no error—plain or otherwise. To be sure, aggravated identity theft, like § 924(c), is a double-decker crime—it requires an identity theft "during and in relation to" an underlying felony (here, healthcare fraud). 18 U.S.C. § 1028A(a)(1). So Chavez is right that aiding and abetting aggravated identity theft requires the intent to assist the *identity theft*, not just the underlying offense. He's also right that such intent must include (at a minimum) "advance knowledge" of the identity theft. After all, you can't intentionally assist an identity theft that you only learn about after it's been committed.

Where Chavez goes wrong is in his belief that the instruction here said anything different. The jury was told that to convict Chavez as an accomplice, the government had to prove:

(A) First, that the crime of aggravated identity theft was committed.

(B) Second, that the defendant helped to commit the crime or encouraged someone else to commit the crime.

(C) And third, that the defendant intended to help commit or encourage the crime.

R. 400, Pg. ID 2935. The instruction then explained that it wasn't enough for the government to prove Chavez "may have known about the crime"—rather, it had to prove "that [he] did something to help or encourage the crime with the intent that the crime be committed." *Id.*

All that was correct. And it covered the "advance knowledge" requirement (even if the district court didn't use those precise words). Again, you can't "d[o] something to help or encourage [a] crime with the intent that the crime be committed" if you don't already know about "the crime." Nor was there any danger that the jury would misunderstand "the crime" that Chavez must have intended to assist as referring to the *underlying* offense of healthcare fraud. In the context of the instruction, "the crime" clearly meant "the crime of aggravated identity theft."

That clarity sets this instruction apart from the one in *Rosemond* and from two others our court has rejected in § 924(c) cases after *Rosemond*. The instructions in all three of those cases wrongly implied that a defendant who intended to help only the *underlying* offense could still be charged and convicted for aiding and abetting the *compound* crime. *See Rosemond*, 572 U.S. at 82; *United States v. Henry*, 797 F.3d 371, 374 (6th Cir. 2015); *United States v. Richardson*, 793 F.3d 612, 630–31 (6th Cir. 2015), *vacated and remanded on other grounds*, 136 S. Ct. 1157 (2016) (mem.). The instruction here, in context, implied nothing of the kind.

B.

*Quoting the Indictment.* Chavez also argues that the jury instructions should not have incorporated parts of the indictment. The government says the plain-error standard applies while Chavez insists he preserved this argument at trial. Either way, the jury instructions survive.

In general, a district court can give a jury a copy of the indictment so long as the court instructs the jury that the indictment isn't evidence of guilt. *United States v. Smith*, 419 F.3d

521, 531 (6th Cir. 2005). Here, the district court gave an appropriate and thorough instruction and provided only quotations, not the whole indictment. Still, Chavez argues that those excerpts were unfairly prejudicial on balance.

Of the four counts read to the jury, three did little more than recite the elements of the corresponding crimes. The fourth was Count I, the charge for conspiracy to commit healthcare fraud. That count was longer than the others and had more factual detail. But that didn't make it objectionable. It described the alleged conspiracy only in broad strokes and in a neutral, evenhanded tone. *Cf. United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979) (no abuse of discretion for giving a summary of the indictment that wasn't "inflammatory or prejudicially worded"). And the description wasn't confusing, misleading, or prejudicial.

Chavez raises three counterarguments, none successful. First, he leans on *United States v. Arboleda*, 20 F.3d 58 (2d Cir. 1994). But there, the district court read the prosecutor's *rebuttal argument* back to the jury hours after deliberation had started. *Id.* at 62. So that case and this one are worlds apart.

Second, Chavez says a lay jury would be tempted to infer guilt from the way the district court introduced each count: "The Grand Jury charged Count [X] of the Indictment as follows[.]" R. 400, Pg. ID 2915, 2923, 2931, 2937. But again, the district court properly instructed the jury that the indictment did "not even raise any suspicion of guilt." *Id.* at 2898. And we presume that the jury followed the court's clear instruction. *See Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000).

Finally, Chavez argues that including Count I risked a nonunanimous verdict by confusing the jury about the object of the conspiracy. But it was clear that the object of the conspiracy (which the jury had to find unanimously) was "to commit the crime of health care fraud." R. 400, Pg. ID 2927. Just as clear was what that meant in the context of this case: "to obtain money from a health care benefit program by billing for services, specifically injections, which were never provided." *Id.* at 2923. Those were the indictment's own words. If anything, including them made it *less* likely that the jury would convict without finding that Chavez knew about the fraudulent billing.

C.

*Multiple Conspiracies.* Finally, Chavez says the district court should have given this circuit's pattern jury instruction about multiple conspiracies. That instruction reminds jurors that to return a guilty verdict on a conspiracy count, the defendant must have joined the conspiracy *charged in that count*, not just any conspiracy. Sixth Cir. Pattern Jury Instruction 3.08(3).

Why does Chavez say the instruction was necessary here? Because the indictment didn't just charge that he conspired with Lezcano, Betancourt, and Diaz. It also charged that those four conspired with two other named individuals (and with other known and unknown co-conspirators). And Chavez points to evidence from which (he argues) the jury could have found that those two people were in a separate conspiracy.

Why would *that* matter? Because, as Chavez sees it, any conspiracy that didn't include everyone named in the indictment isn't "the conspiracy charged in the indictment." Appellant Br. at 66. In other words, even if the government proved that Chavez was part of a conspiracy to commit healthcare fraud, its failure to prove that the two others were *also* members means that Chavez must go free.

Chavez is incorrect—it only takes two to conspire. *See United States v. Crayton*, 357 F.3d 560, 567 (6th Cir. 2004) (citing *United States v. Anderson*, 76 F.3d 685, 688–89 (6th Cir. 1996)); *see also, e.g.*, *Breese v. United States*, 203 F. 824, 831 (4th Cir. 1913).[2] If the government proves a conspiracy between any two or more people named in an indictment, it can convict them. As far as *those* defendants are concerned, it doesn't matter if *others* listed in the indictment weren't in the conspiracy—whether because they were innocent altogether or (as Chavez would have it here) because their conspiracy was a separate one.

---

[2]The oldest American case on point seems to be *People v. Olcott*, 2 Johns. Cas. 301 (N.Y. Sup. Ct. 1801) (Kent, J.). The indictment charged a conspiracy between three people. One was deceased. Another had been acquitted—which meant, under the now-abandoned rule of consistency, that no one else could be convicted of conspiring with him. Justice James Kent (later and better renowned as Chancellor Kent) explained that the other living defendant could still be convicted if a jury found that he had conspired with the dead man. *See id.* at 301, 310–11.

IV.

*The Sentencing Enhancement.* Chavez received a two-level Guideline enhancement for being a "manager" or "supervisor" of the healthcare fraud. United States Sentencing Guidelines Manual § 3B1.1(c) (U.S. Sentencing Comm'n 2018). He now argues that he should not have received that enhancement because he didn't manage or supervise any participant in the scheme.

But Chavez did manage or supervise a participant: Orlando Rodriguez, a Jeffboat employee who recruited patients to the clinics. According to Rodriguez, Chavez (1) recruited him as a patient-for-hire, (2) was often the one who paid him (sometimes showing up at his apartment with cash, sometimes depositing money directly into his bank account), (3) gave him money to distribute to the other Jeffboat workers Rodriguez recruited, and (4) was often the one who confirmed new patients had been referred by Rodriguez. True, Chavez appears to have shared his managerial role with Lezcano and Betancourt. But nothing in § 3B1.1 excludes co-managers. *Cf.* U.S.S.G. § 3B1.1 cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer[.]"). Thus, the district court did nor err in applying the enhancement.

\* \* \*

We affirm.