**NOT RECOMMENDED FOR PUBLICATION**

File Name:  21a0004n.06

Case No. 19-3673

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 05, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | ON  APPEAL  FROM  THE |
| v. | ) | UNITED  STATES  DISTRICT |
| | ) | COURT  FOR  THE  NORTHERN |
| TROY BAKER, | ) | DISTRICT OF OHIO |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

Before:  BATCHELDER, BUSH, and LARSEN, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.**  Troy Baker appeals his conviction by a jury on charges of possession with intent to distribute carfentanil and cocaine.  We affirm.

**I.**

Police began investigating Troy Baker based on a tip that he was "packaging" marijuana, heroin, and other drugs at a specific residential address in Euclid, Ohio.  The woman who called in the tip gave the police her name and telephone number, said that Baker lived at that address, and said Baker "would wear latex gloves while packaging these drugs."

After officers confirmed that address as Baker's residence, as listed on his driver's license, and found that Baker had a prior conviction for cocaine possession and two outstanding felony warrants, they conducted two "trash pulls" a week apart, searching trash bags taken from collection bins outside the residence.  Those trash pulls recovered plastic baggies containing marijuana residue, including one containing about two grams of marijuana, portions of torn-off plastic baggies consistent with drug distribution, and discarded latex gloves.  Police also surveilled the

property on two days, which revealed cars arriving and departing quickly, typical of drug trafficking. The officers then sought and obtained a search warrant and, during execution of the warrant, a search of a basement cabinet revealed a bag containing about 28 grams of crack cocaine and about 218 grams of a substance containing carfentanil (pressed into what looked like candles). A nearby cabinet contained a box of sandwich baggies, a press, latex gloves, a digital scale, and two bottles of mannitol, a material used to make crack cocaine or to expand the amount of powder cocaine. Baker's DNA—along with the DNA from two other people—was on the outer surface of the bag containing the cocaine and the carfentanil, on the bag of cocaine, and on the scale.

The prosecutor charged Baker with possession with intent to distribute carfentanil and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(c). Baker entered a not guilty plea and prepared for trial. Prior to trial, Baker moved to suppress the evidence obtained from the search, requesting "an evidentiary hearing regarding whether the [police] had sufficient evidence to constitute probable cause for a search warrant," and arguing that they did not. The district court denied Baker's request for a hearing, finding that Baker "ha[d] not contested any material facts in the [a]ffidavit," but instead had "challenge[d] the 'four-corners' of the [a]ffidavit" as being "legally insufficient to support a finding of probable cause." Then, "rely[ing] solely on the [a]ffidavit," the court found "a substantial basis for concluding that probable cause existed" and denied the motion to suppress.

Shortly before trial, Baker moved in limine to exclude testimony about the tip to the police but did not request a hearing. The court denied the motion, finding that reference to the tip was admissible to put the investigation, search warrant, and DNA testing into context, but said it planned to instruct the jury that the tip was not evidence of guilt. At trial, Detective Ben Kreischer was the first of two officers to testify for the prosecution, and though the tip was first brought up by the government in its opening statement, it was Baker's defense counsel who first asked about

2

the tip during Kreischer's cross-examination. Kreischer, however, could testify only to his awareness that the other officer, Brett Buchs, had received the tip. On direct examination of Buchs, the prosecutor raised the tip as the impetus for the investigation:

| | |
|---|---|
| Prosecutor: | Turning now to this investigation, did you eventually become involved in an investigation of Troy Baker? |
| Buchs: | I did. |
| Prosecutor: | And how did that investigation begin? |
| Buchs: | I received a phone call from a—I guess we'll call it a CI that provided me the name. This CI did leave their name and phone number for me to contact them back at. She advised that this person had seen Troy in the house packaging drugs— |
| Defense counsel: | Objection. |
| The Court: | Ladies and Gentlemen, a caution here. This is some background information which starts the investigation. This is not any evidence of the defendant committing these crimes. |
| | I want you to keep that in mind. Again, only background evidence which starts the investigation. You shall not use that as any evidence against this defendant. |
| | Everybody understand that? Okay. Let the record reflect everybody understands. |
| | Go ahead, Miss [prosecutor]. |
| Prosecutor: | Thank you, Judge. |
| | [To Buchs:] So to be clear, you received this call, correct? |
| Buchs: | I personally received this call, yes. |
| Prosecutor: | And I believe [counsel] objected during the middle of your answer. Can you finish what else you learned from this call? |
| Buchs: | Just that Troy Baker was seen in the house, again, wearing latex gloves and packaging up dope. |
| Prosecutor: | Okay. And what did you do to try to corroborate whether this information was accurate? |

Defense counsel did not object further and Buchs continued to testify, describing the database search that matched Baker's driver's-license address to the tip address, the trash pulls and surveillance at that address, and ultimately the execution of the search warrant. On cross-examination, Buchs admitted that the police did not spot Baker during the surveillance, that no

3

mail nor anything else from the trash pulls demonstrated that Baker lived at that address, and that the materials from the trash pulls were not tested for DNA.

Baker's mother, Wanda Perdue, testified in his defense and said that she owned the house and lived there with two of her adult sons, as well as the girlfriend and baby of one of those sons. During the search, police had discovered Baker's personal items in a third-floor attic bedroom and Perdue testified that Baker used that bedroom "whenever he wanted," though, when at the residence, he spent most of his time in the basement, which she called the "man cave." She also testified that Baker had been there on the Saturday before the execution of the search warrant, but that six or seven other people had been at the residence that day as well.

At the close of evidence and argument, the court instructed the jury, using the Sixth Circuit pattern jury instructions, which included the following instruction for constructive possession:

> To establish constructive possession, the government must prove that the defendant had the right to exercise physical control over the controlled substances and knew that he had this right, and that he intended to exercise physical control over the substances at some time either directly or through other persons.

*See* Sixth Cir. Pattern Instr. 2.10. Baker's attorney did not object to the jury instructions. During deliberations, the jury asked two questions relevant here.

First, the jurors asked: "Can we consider the tip called into the [police] by the CI as evidence for deliberation? Detective Buchs mentioned it in his testimony. May we see the record of that?" After conferring with counsel, the district court answered:

> Dear Ladies and Gentlemen of the Jury. I am here in chambers with counsel. . . .
>
> We have agreed on the following response: As I specifically instructed you during Detective Buchs'[s] testimony, you may not consider the tip as evidence during your deliberations. As I explained to you in court, the tip is simply background information that started the investigation.
>
> Based upon this answer, you may not see any record of Detective Buchs'[s] testimony, nor any record of any other witness's testimony. You must rely on your collective memories. Please continue with your deliberations.

4

Before giving this answer to the jury, the district court had confirmed on the record that both the prosecutor and defense counsel agreed to it.

The jury's other relevant question was about the constructive-possession instruction: "In Section 15(3) of the instructions we were provided, can we get further clarification of 'right to exercise physical control'—is there a synonym for 'right' we could use?" Again, the district court conferred with counsel and prepared a written answer:

> Dear Ladies and Gentlemen of the Jury: I have received your [] question asking whether there is a synonym for 'right' as used in instruction 15(3). I have shared this with counsel, and we have agreed to the following response: You may substitute the word 'ability' for 'right' as it appears twice in 15(3).
>
> Please continue with your deliberations.

Again, before giving this answer to the jury, the district court confirmed on the record that both the prosecutor and defense counsel agreed.

A short time later, the jury returned its verdict, finding Baker guilty of both counts of the indictment. The court sentenced him to 200 months in prison.

## II.

Baker claims the district court erred by refusing to hold a *Franks* hearing, *see Franks v. Delaware*, 438 U.S. 154 (1978), to test the validity of the search warrant. We recently issued a very clear statement of the *Franks* hearing analysis, and our review thereof, in *United States v. Bateman*, 945 F.3d 997, 1007-08 (6th Cir. 2019), with the pertinent provision here being:

> To be entitled to a *Franks* hearing, [a defendant] must (1) make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and (2) prove that the false statement or material omission is necessary to the probable cause finding in the affidavit. . . . [The] defendant must point out specifically the portion of the warrant affidavit that is claimed to be false.

*Id*. (quotation marks, editorial marks, and citations omitted). In his motion to suppress, Baker requested an evidentiary hearing, but he did not challenge the truth of any of the facts or evidence

in the affidavit; instead, he argued that the facts and evidence in the four corners of the affidavit did not meet the legal threshold of probable cause. More importantly, Baker neither raised a *Franks* issue nor pointed to any false statement in, or material omission from, the search warrant affidavit. In his subsequent motion in limine, Baker did not request any hearing at all. Therefore, the district court did not err by proceeding to decide the motions without a *Franks* hearing.

Baker's actual argument on this issue, however, is not about the trial court's failure to conduct a *Franks* hearing, but rather that, in his view, the statements and evidence provided in the affidavit did not establish probable cause. He relies on *United States v. Abernathy*, 843 F.3d 243, 253 (6th Cir. 2016), for the proposition that "mere trash pull evidence, standing alone, is insufficient to create probable cause to search a residence." But, contrary to Baker's claim, the police did not have "mere trash pull evidence, standing alone." The police had the tip, from an identified and contactable informant, which told them Baker's name, that the address was his residence, and that he used latex gloves to package drugs, including marijuana. The evidence collected from the trash pulls, including the residual marijuana, baggie tear offs (typical of drug packaging and use), and latex gloves, confirmed the tip, as did the record review confirming the address as Baker's residence from his driver's license, that Baker had a prior criminal conviction for cocaine possession, and that he had two outstanding felony warrants. Finally, the surveillance revealed frequency of visits to the residence indicative of drug trafficking. There was sufficient evidence presented in the affidavit to establish probable cause.

Baker next claims that he is entitled to a new trial because Detective Buchs's testimony was incurable, reversible error. Recall that, when the prosecutor asked Detective Buchs how the investigation began, Buchs testified that, when he returned a call to a woman who had left her name and phone number, she "advised that [she] had seen Troy [Baker] in the house packaging

6

drugs." Whereupon Baker's counsel interrupted with an objection and the court, without expressly ruling on the objection, gave the jury a curative instruction:

> Ladies and Gentlemen, a caution here. This is some background information which starts the investigation. This is not any evidence of the defendant committing these crimes. I want you to keep that in mind. Again, only background evidence which starts the investigation. You shall not use that as any evidence against this defendant. Everybody understand that? Okay. Let the record reflect everybody understands. Go ahead, Miss [prosecutor].

Baker's counsel did not object further; nor did he move for a mistrial or even move the court to strike the testimony. The prosecutor continued to question Buchs, who added that, according to the tipster, "Troy Baker was seen in the house, again, wearing latex gloves and packaging up dope." Baker's counsel did not object to this statement and Buchs went on to describe the ensuing investigation. Although counsel's single objection preserved this issue for appellate review, it is noteworthy that—given his current contention that this error was so egregious that it necessitates a whole new trial—the transcript suggests his satisfaction with, or at least acquiescence to, the curative instruction. Therefore, to the extent the court "admitted" this testimony, it appears that it did so with only limited protest from Baker.

Accepting this as an ordinary evidentiary ruling, we review challenges to such rulings for an abuse of discretion. *United States v. Chavez*, 951 F.3d 349, 357-58 (6th Cir. 2020). The court determined that this was "background information," offered to explain how the investigation originated and led to the defendant, which is admissible. *See United States v. Gibbs*, 506 F.3d 479, 484 (6th Cir. 2007); *United States v. Manzano*, 793 F. App'x 360, 366 (6th Cir. 2019). Moreover, the jury is presumed to follow the court's curative instructions. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 574 (6th Cir. 2019) (quoting *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012)); *see also Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000) (relying on the "curative instructions the court gave, which we must presume to have been effective unless there is an 'overwhelming probability' that they were ignored") (quoting *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)).

Baker argues that the court abused its discretion by admitting Buchs's testimony because it was not merely background information but, rather, was inadmissible hearsay that was introduced to prove the truth of the matter asserted, namely that Baker possessed and distributed the drugs discovered during the search. He further argues that the hearsay was far more prejudicial than probative because the prosecution had no direct evidence of Baker's possessing, packaging, or distributing the drugs; it had only constructive possession and circumstantial evidence, based on Baker's lodging at the residence and his DNA on the drug packaging and scale. He concludes that these two statements—that the tipster "had seen [Baker] in the house packaging drugs" and "wearing latex gloves and packaging up dope"—were so prejudicial, in fact, that the curative instructions were insufficient to prevent the jury from relying on the hearsay to convict him.[1]

Baker relies on *United States v. Nelson*, 725 F.3d 615, 618 (6th Cir. 2013), *as clarified on denial of reh'g* (Jan. 16, 2014), in which we reversed Nelson's conviction for illegally possessing a firearm due to the district court's admission of inadmissible hearsay testimony by five police officers. That testimony recited in detail a 911 caller's description of Nelson and accusation that Nelson had the gun. *Id.* In short, the dispatcher broadcast the information from a 911 call "that a black man wearing a blue shirt, with a 'poofy' afro, riding a bicycle, was armed with a pistol," and the responding officers immediately identified Nelson, "who precisely matched this description." *Id.* Despite the officers' shouts for him to stop, Nelson fled on his bicycle and threw an object into the nearby bushes. Officers apprehended Nelson and recovered the object from the bushes, which turned out to be a gun. "[T]his entire sequence of events took place in approximately one minute."

---

[1] In his appellate brief, Baker makes a solitary cite to *Crawford v. Washington*, 541 U.S. 36 (2004), in support of the proposition that "Every defendant enjoys a 'bedrock procedural guarantee' to confront witnesses who testify against him." He does not elaborate on this assertion in any meaningful way, nor does he raise an actual *Crawford* claim. Because the information in the tip was not "evidence" for consideration by the jury—as we confirm herein—and, therefore, the tipster was not a witness against Baker, *Crawford* does not apply.

*Id.* at 619. That is, the entire response, investigation, and arrest essentially started and ended with the 911 call.

Baker points out that, just as in his trial, the *Nelson* court admitted the officers' testimony "as background information, and gave the jury a limiting instruction after each officer's testimony," *id.* at 618; the prosecution's "other evidence was circumstantial, a[s] no officer testified to having seen Nelson possess a gun," *id.* at 621; and that the hearsay "testimony went to the very heart of the sole disputed issue for the jury's resolution, namely whether Nelson possessed a gun," *id*. Thus, Baker argues that *Nelson*'s analysis and conclusions should control here.

But there are certainly distinguishing facts as well. In *Nelson*, five officers testified and each repeated the same testimony "that a man fitting Nelson's exact description was seen armed with a handgun," and "at least one officer testified that he relied on the hearsay evidence to conclude that Nelson possessed a gun." *Id*. "Because five separate officers each testified as to what the dispatcher told them, the fact that Nelson matched the description provided by the 911 caller was repeatedly emphasized at trial [and] the consistency of the officers' testimony about the suspect made it likely the jury would credit their testimony." *Id.* at 621-22. At Baker's trial, Detective Buchs made two alleged hearsay statements: the tipster "had seen [Baker] in the house packaging drugs" and "wearing latex gloves and packaging up dope." But the investigation and arrest of Baker did not start and end with the tip; rather the tip started the investigation, which led to the database search to confirm Baker's residence, the trash pulls and surveillance to establish probable cause for the warrant, and the execution of the warrant that found Baker's DNA on the drug packages and scale. The description of these investigatory activities, as well as the implications of the seized evidence towards the likelihood of trafficking or distribution, comprised the vast majority of Buchs's testimony. To be sure, Buchs's two alleged hearsay statements

implicated Baker, but so did Baker's ready access to the drugs in the basement and his DNA on the drug packages and scale.

We also have the court's curative instructions. As already stated, we ordinarily presume that the jury follows the court's curative instructions, *Hubbell*, 933 F.3d at 574. To that end, we generally find that instructions were "effective unless there is an 'overwhelming probability' that they were ignored," *Scott*, 209 F.3d at 879. In *Nelson*, we determined that:

> The curative instructions[] were not sufficient to eliminate the prejudice *on the facts of this case*. Although the district court gave the jury a limiting instruction after each officer's testimony—reminding them that the evidence about the suspect's description was not to be considered for its truth—the prejudicial nature of the evidence and the fact that it went to the key issue for the jury's resolution made it unlikely that the limiting instruction adequately protected Nelson from prejudice.

*Nelson*, 725 F.3d at 622 (emphasis added). At Baker's trial, the court gave the jury the limiting instruction in the midst of Detective Buchs's testimony: "This is not any evidence of the defendant committing these crimes. I want you to keep that in mind. . . . You shall not use that as any evidence against this defendant. Everybody understand that? Okay. Let the record reflect everybody understands." Baker argues that this instruction was ignored, as demonstrated by the jury's question, during deliberations, about this specific testimony.

While the jury question during deliberations could suggest that the jury ignored the trial court's contemporaneous curative instruction, *see Scott*, 209 F.3d at 879, it is also fatal to Baker's argument here because it led to the trial court's second express instruction that included the admonishment: "As I specifically instructed you during Detective Buchs'[s] testimony, you may not consider the tip as evidence during your deliberations. . . . [T]he tip is simply background information that started the investigation." There is no basis for us to find, by an "overwhelming probability," that the jury ignored that second instruction. Thus, even if the trial court erred in permitting the testimony based on a finding that it was not inadmissible hearsay but proper background information, that error was harmless. The court's jury instruction provides us "fair

10

assurance" that the verdict was not "substantially swayed" by the limited testimony. *See Chavez*, 951 F.3d at 358 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Baker's third claim on appeal is that the district court mis-instructed the jury—in answering a question—when it allowed the jury to consider the word "ability" as a synonym for "right" in deciding whether to find constructive possession under the pattern instruction. This, Baker argues, allowed the jury to convict him for conduct that is not a crime because "ability" is not the same as "right" and a person may *be able to* possess something without actually or constructively possessing it. Ordinarily, we review a district court's answer to a jury query for an abuse of discretion. *United States v. Fisher*, 648 F.3d 442, 446-47 (6th Cir. 2011). But, here, the court consulted the parties before answering and Baker's attorney expressly agreed that the jury could substitute "ability" for "right." Consequently, Baker, through his attorney, waived this claim. *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990) ("An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course."). And claims that have been waived are generally not reviewable, even for plain error. *United States v. Olano*, 507 U.S. 725, 733 (1993). But "we have recognized that [such] 'invited error' does not necessarily foreclose relief when the interests of justice demand otherwise," in which case we will review the challenge for plain error, "an inquiry that requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Howard*, 947 F.3d 936, 945 (6th Cir. 2020) (quotation marks and citations omitted). Under plain-error review, we hold that the jury's consideration of "ability" as a synonym for "right" in the constructive-possession instruction was not so clearly erroneous as to produce a grave miscarriage of justice.

Finally, Baker claims that the district court erred by denying his motion for acquittal based on insufficient evidence because no one saw him possess the drugs, no one testified that he sold

drugs, his six brothers and an adult nephew all had equal access to the basement where the drugs were found, and the presence of his DNA (mixed with at least two other people's DNA) on the outside of the bags and on a scale was not enough to support the verdict. We review claims of insufficient evidence by considering "the evidence in the light most favorable to the prosecution," and asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Baker argues that, based on the foregoing limitations in the government's evidence, no reasonable juror could find beyond a reasonable doubt that he possessed the drugs or intended to distribute them. But, while these are appropriate arguments for a jury, they do not change the evidence that was actually presented.

The evidence produced at trial established that Baker had unlimited access to the residence, and particularly the basement, where the drugs were discovered; in fact, evidence established that he resided in a third-floor bedroom at least occasionally. Moreover, the bags containing the drugs, including one inside the other, and the digital scale located near the drugs but in a different cabinet, all had Baker's DNA on them. A reasonable juror could infer from this that Baker had access to the drugs, that he had physically handled the drugs and the scale (a tool for distributing drugs), and, therefore, that he had at least constructive, if not actual, possession. Finally, a reasonable juror could infer from the quantity of drugs, and the evidence of trafficking activity from the trash dumps (i.e., baggie tear offs and latex gloves) and surveillance (revealing frequent short term visitors), that the drugs were possessed at this residence for the purpose of distribution.

**III.**

For the foregoing reasons, we AFFIRM the judgment of the district court.