NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0458n.06

Case No. 21-5143

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 15, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| BAAKI ABDUL MAJEED, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: McKEAGUE, THAPAR, and READLER, Circuit Judges.

THAPAR, Circuit Judge. For his involvement in a scheme to prey on the elderly, a jury convicted Baaki Abdul Majeed of conspiracy to commit wire fraud, conspiracy to commit money laundering, and five counts of substantive money laundering. We affirm.

I.

In March 2017, an elderly Kentucky woman met a man on Facebook calling himself "James Nehmer." But Nehmer was a false identity: In reality, the woman was communicating with a scammer whose goal was to convince her to send him money. Nehmer sent the woman photos of a U.S. Army soldier whose uniform nameplate read "James." The scammer pretended these were photos of himself.

Nehmer feigned romantic interest, making the woman believe they were in love. Then Nehmer told the woman he had purchased "precious metals and gemstones" in Africa. R. 238, Pg.

ID 1381–82. Nehmer convinced the woman he would come join her in the United States, sell the treasure in New York for millions of dollars, and use the proceeds to fund their new life together. But first Nehmer needed help: Nehmer asked the woman to send money so he could pay taxes and fees to transport his treasure to the United States.

The scam was a success. Over a six-month period, Nehmer convinced the woman to send him $757,000. Throughout that period, Nehmer brought in others to assist with the scheme. In April 2017, Nehmer persuaded the woman to wire him $150,000, but her bank blocked the transaction. So Nehmer told the woman to send the money to his associates: Baaki Abdul Majeed and Majeed's cousin, Kahad Wuupini.

Majeed never spoke directly with Nehmer or the victim—instead, Wuupini kept Majeed informed. But Majeed accepted direct transfers from the victim in his own name and on behalf of the business he created for this purpose, All Green Global.

In total, Majeed received $389,000 from the victim, usually in the form of cashier's checks. Majeed, in turn, wired some of those funds to individuals in Ghana. He also bought luxury cars to send to Ghana, sent checks to Wuupini, moved funds between his business and personal accounts, and withdrew thousands of dollars in cash.

Wuupini and Majeed regularly discussed these transactions, with Wuupini often forwarding Majeed screenshots of his correspondence with a co-conspirator whom Majeed and Wuupini called "the Boy." The Boy was either the individual posing as Nehmer or someone close to that person. In one conversation, Wuupini and the Boy referred to the victim as a "mugu" who could "pay up to a million dollars." R. 239, Pg. ID 1445. The word "mugu" is a slang term used in Ghana to describe "the victim" of a "scam," or a "fool" who "has been duped" by scammers.

R. 240, Pg. ID 1706, 1741.  When Wuupini forwarded that conversation, Majeed responded with excitement at the prospect of collecting a million dollars.

In other instances, the conspirators discussed controlling the victim and covering their tracks.  In one conversation, Wuupini told the Boy he hoped the victim was "under control."  R. 239, Pg. ID 1440.  Wuupini forwarded that conversation to Majeed.  Majeed responded "[o]kay good."  R. 239, Pg. ID 1441. Later, Majeed and Wuupini discussed breaking up large sums into piecemeal transactions to avoid scrutiny from the bank.  In another instance, after the victim expressed concerns about "problems" with the transactions, Wuupini instructed the Boy to "tell [the victim] any story you think she would believe."  R. 239, Pg. ID 1454.  Again, Wuupini forwarded this conversation to Majeed.

Majeed, Wuupini, and a third co-conspirator named Thomas Inkoom were arrested in 2019. The government never proved who was posing as Nehmer—that individual remained an unindicted coconspirator.  But Wuupini and Inkoom both pled guilty, received prison sentences, and were ordered to pay restitution.  Majeed maintained his innocence.  After a four-day trial, a jury convicted Majeed of conspiracy to commit wire fraud under 18 U.S.C. § 1349, conspiracy to commit money laundering under 18 U.S.C. § 1956(h), and five counts of substantive money laundering under 18 U.S.C. § 1957.  The court then sentenced Majeed to 72 months' imprisonment followed by 3 years' supervised release and ordered him to pay $757,000 in restitution.

II.

Majeed raises three issues on appeal.  None provides a basis to disturb the judgment below.

A.

First, Majeed challenges the sufficiency of the evidence supporting his convictions.  To convict Majeed on any charge, the government had to prove that Majeed knew of the fraud.  *See*

*United States v. Sadler*, 24 F.4th 515, 542 (6th Cir. 2022). Knowledge can "be inferred from surrounding circumstances," and the government didn't have to prove Majeed "knew each detail of the conspiracy." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) (cleaned up). Because the jury convicted Majeed, we view the evidence in the light most favorable to the government. *United States v. Conrad*, 507 F.3d 424, 432 (6th Cir. 2007).

There was sufficient evidence for the jury to conclude Majeed knew he was involved in a fraudulent scam. For one, Majeed received a total of $389,000 from the victim, and when those funds came in, Majeed and Wuupini strategized to avoid scrutiny from the bank—suggesting Majeed knew their transactions were not legitimate. For another, Majeed's responses to the forwarded conversations between Wuupini and the Boy support the inference that Majeed knew he was involved in defrauding the victim.

Majeed offers an innocent explanation for his actions: He was merely helping Wuupini ship luxury cars to Ghana, a legitimate business venture. But it "is well settled that when a defendant offers an innocent explanation for the incriminating facts proved by the government, the jury is free to disbelieve it." *United States v. Schreane*, 331 F.3d 548, 562 (6th Cir. 2003) (cleaned up). And here, that's precisely what the jury did. Given the ample evidence from which the jury could infer Majeed's knowledge of the fraud scheme, Majeed's alternative explanation provides no reason to disturb his convictions.

B.

Second, Majeed argues that the district court abused its discretion by admitting an email he sent to himself five years before the charged conduct. The email contained two photos of the same U.S. Army soldier Nehmer posed as in 2017. The court determined the email was relevant to establish Majeed's prior knowledge of the scam.

Federal Rule of Evidence 403 "provides a balancing test for excluding relevant evidence." *United States v. Clark*, 24 F.4th 565, 579 (6th Cir. 2022). As applicable here, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice" or "misleading the jury." Fed. R. Evid. 403. This test "is strongly weighted toward admission." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).

The district court reasonably determined the email was probative of Majeed's awareness of the scheme. True, Majeed sent the email to himself five years before the conspiracy in this case. But trial testimony showed that photographs of this particular U.S. Army soldier had been "circulated in connection with fraud schemes for some period of time." R. 239, Pg. ID 1409-10. The fact that Majeed had previously emailed himself photographs of this soldier refuted his claim that he didn't know the nature of the scheme.

It was well within the district court's discretion to conclude the email's probative value was not substantially outweighed by any risk of unfair prejudice or misleading the jury. Majeed argues the email was unfairly prejudicial because there was no other evidence he knew about the scam. Not so. There was ample evidence from which the jury could draw that inference, such as the text conversations with Wuupini. Additionally, Majeed contends the email misled the jury because no evidence suggests the two specific photos attached to his email were ever sent to the victim. But the government never suggested these specific photos were used in the instant scam: Instead, the government presented the email only to "prov[e] that [Majeed] was aware of this person [the soldier], this identity, and the possibility of this scam." R. 239, Pg. ID 1401.

Majeed also argues that even if the email were admissible, the court should have provided a limiting instruction under Rule 403. But while Majeed's trial attorney requested a limiting instruction under Rule 404(b)—which restricts the admission of evidence of "other crime[s]"—he

never requested a limiting instruction under Rule 403. So it's Majeed's burden to show the district court plainly erred by failing to give that instruction. That means he must show "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Ferguson*, 681 F.3d 826, 831 (6th Cir. 2012) (citation omitted). Majeed hasn't even attempted to make that showing here.

And even if Majeed had demonstrated error, any such error would be harmless. The government presented plenty of other evidence besides the 2012 email to demonstrate Majeed's knowledge of the scheme. So neither the court's decision to admit the email, nor its alleged failure to give a limiting instruction under Rule 403, would've "materially affected the verdict." *United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012) (citation omitted); *see also* Fed. R. Crim. P. 52(a).

## C.

Third, Majeed argues that through intimidation, the government improperly prevented him from testifying on his own behalf. Specifically, he points to the prosecutor's statement that she intended to cross-examine Majeed about a prior encounter with Homeland Security. Because Majeed didn't make this "specific objection" below, we again review for plain error. *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004). And just as before, Majeed identifies no error by the district court, let alone a plain one.

For one thing, the prosecutor's statement was permissible. As the prosecutor explained, Majeed's testimony about the customs stop would be "relevant to his truthfulness." R. 239, Pg. ID 1400–01. Although the prosecutor's statement might've persuaded Majeed not to testify, that statement hardly "preclude[d] him from making a free and voluntary choice whether or not to testify." *Webb v. Texas*, 409 U.S. 95, 98 (1972).

For another, even if we assume the prosecutor's statement was improper, Majeed points to no error by the district court that warrants our correction on plain-error review: Following the prosecutor's statement, the district court engaged in a lengthy colloquy with Majeed to ensure his decision not to testify was "free and unhampered." *See United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973). It's Majeed's burden to identify an error so obvious that the district court should have corrected it sua sponte. *See United States v. Chavez*, 951 F.3d 349, 357 (6th Cir. 2020) (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)). He hasn't made that showing here.

\* \* \*

We affirm.